MISSOURI RIVER SAND COMPANY, PETITIONER *V.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15685–80.     Filed August 7, 1984.

---

*Ernest M. Fleischer* and *Richard Monaghan*, for the petitioner.

*Patrick Dowling*, for the respondent.

WILES, *Judge*: Respondent determined deficiencies in petitioner's Federal income taxes for the fiscal years ending March 31, 1975, and March 31, 1976, in the amounts of $3,876.36 and $4,478.07, respectively. The issue for decision is whether petitioner held an economic interest in the sand deposits it dredged from the Missouri River within the meaning of section 1.611–1(b)(1), Income Tax Regs.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation organized under the laws of the State of Missouri, with its principal place of business located in Columbia, MO, at the time its petition was filed in this case. At all relevant times, petitioner's sole shareholder was Harold E. Johnson.

Petitioner is engaged in the business of extracting sand and gravel from the Missouri River at Boonville and Rocheport, MO.[1] The Missouri River is classified as navigable under section 10 of the Rivers and Harbors Act of 1899, 30 Stat. 1151, 33 U.S.C. sec. 403 (1982), and in the areas surrounding petitioner's operation, the river is freely navigated by significant commercial river traffic. In Missouri, title to the beds of navigable rivers between their low water marks is held by the State, but the right to dredge and remove sand and gravel from the beds of navigable rivers is a public right available to all people of the State. Upon removal, sand and gravel dredged from navigable Missouri rivers becomes the private property of the person appropriating the material.

While State law determines title to the beds of navigable rivers, dredging operations must be conducted pursuant to permits issued by the Department of the Army, Corps of

---

[1] During the years in issue, in addition to income derived from sand sales, petitioner received income from the unloading of salt at its Boonville facility and from hauling charges.

Engineers. During the period from 1950 to 1972, one of petitioner's two predecessors in interest[2] operated under a renewable permit issued by the Corps of Engineers which authorized it to dredge in the Missouri River between river miles 191 and 206 near petitioner's Boonville dock. Said permit was transferred to petitioner on June 1, 1972, and was periodically renewed throughout the years in issue. The other of petitioner's predecessor corporations operated pursuant to a Corps of Engineers permit which allowed it to dredge in several locations in the Missouri River, including the area between river miles 168 and 205 near petitioner's Rocheport dock. This permit was issued to the Columbia Sand Co. which was a registered fictitious name of petitioner's sole shareholder, Harold E. Johnson, and, after September 1972, became a registered fictitious name of petitioner. Throughout the years in issue, petitioner apparently operated under the continuing authority of its predecessor's permits since the Corps of Engineers never challenged petitioner's right to dredge in the vicinity of its Rocheport facility. In April 1975, the Corps of Engineers issued a permit in petitioner's name to dredge river miles 168 and 206 in the vicinity of petitioner's Rocheport facility.

The permits issued by the Corps of Engineers prescribe the areas in which petitioner may dredge sand and gravel from the bed of the Missouri River. The permits do not convey any property rights either in real estate or materials, nor any exclusive privileges. The permits may also be suspended, modified, or revoked at any time by authority of the Secretary of the Army if it is determined that revocation is in the public interest. Petitioner has not and does not pay any royalty to the United States with respect to the permits issued by the Corps of Engineers, nor petitioner pay any other fee or royalty to the State of Missouri with respect to its dredging operations.

During the years in issue, petitioner owned and operated one suction-type dredge boat which it used in its dredging operations at both Boonville and Rocheport. Petitioner periodi-

---

[2]Petitioner was created by the reorganization of petitioner's predecessor, the Missouri River Sand & Gravel Co., Inc., into two separate entities, one of which operated a quarry and the other, petitioner, which continued to dredge sand and gravel near Boonville. Subsequently, the assets of the Columbia Sand Co., an entity owned by Harold E. Johnson, were transferred to petitioner giving it the facility at Rocheport, MO. Title to the land at the Rocheport facility was held by Harold E. Johnson who leased it to petitioner throughout the years in issue.

cally navigated its dredging equipment the 10 miles between Boonville and Rocheport in order to dredge in the vicinity of either facility depending upon the water conditions and demand for sand in each area. Generally, petitioner dredged sand at each location as needed or until its stockpiles were filled to capacity. At each site, the dredge pumped sand and gravel from the river bed, screened it to obtain material of the desired sizes, and deposited it in barges which were moved by towboats to petitioner's docks. At Rocheport, a clamshell crane moved the sand from the barges to a conveyor which ran the material behind the levee to a stockpile area. At Boonville, a clamshell crane moved sand from the barges directly to petitioner's stockpile area.

Petitioner is a commercial sand-dredging operator,[3] which requires that it provide sand of specific size and quality to meet the specifications established by purchasers of petitioner's products. For petitioner's primary market, the ready-mix concrete manufacturers, petitioner had to locate sand deposits which were low in lignite, an undesirable impurity which rendered many sand deposits unusable for the ready-mix concrete market. To avoid lignite, it is necessary to selectively dredge sand deposits. Sand deposits located in swifter water tend to contain less lignite, but it is not possible to consistently find lignite-free sand in the same location.

The sand and gravel unloaded at petitioner's Rocheport facility was dredged from the stretch of the Missouri River extending from the facility upriver approximately three-quarters of a mile. At Boonville, petitioner primarily dredged

---

[3]Throughout the years in issue, contract dredgers also operated on the Missouri River. Contract dredgers typically extract huge quantities of material, up to 2 million tons, which is used as fill for large construction projects such as levees or highways. The material extracted for large projects consists of a natural mix of sand and gravel containing all but the finest silt, and it requires little or no processing. Contract dredgers do not need to stockpile materials because shortly after the sand and gravel is extracted, it is hauled from the river to the construction site. Commercial dredgers, on the other hand, require an area in which they can stockpile materials of various sizes to ensure adequate supplies are available for their customers.

The following chart shows the amounts of dredged sand unloaded at each of petitioner's facilities, and the amounts of petitioner's income attributable to the sale of said sand during the taxable years in issue:

| | Boonville facility | | Rocheport facility | |
| FYE Mar. 31 | Dredged sand unloaded (in tons) | Sand sales | Dredged sand unloaded (in tons) | Sand sales |
| --- | --- | --- | --- | --- |
| 1975 | 106,753 | $101,082 | 66,806 | $86,913 |
| 1976 | 72,412 | 94,405 | 81,689 | 110,835 |

deposits located within 200 yards upstream of its unloading facility. Because it is expensive and difficult to push loaded barges upriver, petitioner rarely, if ever, dredged deposits downstream from either facility.

The factors which are significant in determining whether a site is suitable for unloading and marketing sand include: the cost of developing a site in relation to the anticipated market for sand; access to the market via suitable roads and highways; adequate stockpile areas; lack of interference from river traffic in the dredging areas that would compromise the safety of the equipment; the distance that loaded barges must be towed from deposits to the unloading sites; the location, height, and type of river control structures; and the general topographical features of the land adjacent to the river. Based on these factors, there are no permanent sites suitable for profitable dredging operations adjacent to the deposits in which petitioner dredges in either the Rocheport or Boonville areas.[4]

On its income tax returns for fiscal years ending March 31, 1975, and March 31, 1976, petitioner claimed deductions of $9,391.35 and $10,262.02, respectively, for percentage depletion of sand and gravel. Respondent disallowed these deductions in their entirety on the ground that petitioner did not have an economic interest in the sand and gravel removed from the bed of the Missouri River during the years in issue.

## OPINION

We must decide whether petitioner has an economic interest within the meaning of section 1.661-1 (b)(1), Income Tax Regs., in the sand deposits it dredged from the Missouri River which would entitle it to depletion deductions in determining its taxable income during each of the years in issue.

Petitioner argues that it controlled the only land from which it was economically feasible to dredge in the vicinity of its Rocheport and Boonville facilities, and that under the case law, it had economic control of, and therefore, an economic

---

[4]During periods of high water, when the Boonville facility became flooded, petitioner's predecessor corporation occasionally used the Spring Hollow wharf to unload sand and gravel. The Spring Hollow wharf is located approximately nine-tenths of a mile upriver from petitioner's Boonville facility. While this facility was acceptable as a temporary unloading dock at high water, it is not suitable for a permanent unloading facility for a commercial dredger, such as petitioner's, because there is insufficient storage area, the river is shallow, and the sand has to be hauled up a steep hill and through a subdivision in order to get to the highway.

interest in, the sand and gravel adjacent to its riparian properties. Respondent maintains that petitioner's dredging, pursuant to permits issued by the Corps of Engineers which did not give the petitioner any legal rights in the deposits, is not entitled to percentage depletion because petitioner lacked an economic interest in the deposits. Furthermore, respondent maintains that petitioner's economic control argument is erroneous and misstates the test for an economic interest.

Section 611(a)[5] provides as a deduction in computing taxable income a reasonable allowance for depletion pursuant to regulations prescribed by the Secretary. Section 613(a) and section 613(b)(6) provide, with certain exceptions not relevant herein, that in the case of sand, the allowance for depletion under section 611(a) shall be 5 percent of the gross income from the property (as defined in sec. 613(c)).

Depletion deductions are allowed on the theory that mineral deposits are wasting assets and that the extraction of minerals gradually exhausts the capital investment in the mineral deposit.[6] The deduction is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired. *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308 (1956). However, the arbitrary percentage depletion deduction allowed under section 613 bears little relationship to the taxpayer's capital investment, and the taxpayer may continue to claim percentage depletion deductions so long as minerals are extracted, even if the amount recovered exceeds the taxpayer's capital investment and no money was actually invested in the deposit. *Commissioner v. Southwest Exploration Co., supra* at 312.

Depletion deductions are allowed only to the owner of an "economic interest" in the mineral deposits. The test for determining whether a taxpayer possesses an economic interest is whether the taxpayer has (1) acquired by investment any interest in the mineral in place, and (2) whether the taxpayer looks to the income derived from the extraction of the mineral for a return of his investment. *Palmer v. Bender*, 287 U.S. 551,

---

[5]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[6]At trial, the parties did not dispute that the sand and gravel that petitioner dredged in the vicinity of its Rocheport and Boonville facilities is a wasting asset.

557 (1933); sec. 1.611–1(b), Income Tax Regs. Although an economic interest does not require that money actually be invested in the minerals in place (*Weaver v. Commissioner*, 72 T.C. 594, 602 (1979)), "There must exist some element of 'ownership' in the mineral deposit 'in place' *and* a right to share in the income from its production." *Holbrook v. Commissioner*, 65 T.C. 415, 419 (1975). A mere economic advantage derived from production, however, does not constitute an economic interest. *Commissioner v. Southwest Exploration Co.*, *supra*; sec. 1.611–1(b)(1), Income Tax Regs. The determination of whether a taxpayer has an economic interest depends upon the facts in each case. *Ramey v. Commissioner*, 398 F.2d 478, 479 (6th Cir. 1968), affg. 47 T.C. 363 (1967).

We do not think that petitioner acquired by investment any interest in the minerals in place within the meaning of the regulations and the case law. Petitioner only acquired a nonexclusive license to dredge materials from the river. Such a license does not convey "any interest" in the sand and gravel "in place" but rather transfers a mere economic or pecuniary advantage derived from production. See *Holbrook v. Commissioner*, *supra* at 420. Petitioner's reliance on *Commissioner v. Southwest Exploration Co.*, *supra*, which was followed in *Oil City Sand & Gravel Co. v. Commissioner*, 32 T.C. 31 (1959), and *Victory Sand & Concrete, Inc. v. Commissioner*, 61 T.C. 407 (1974), is misplaced. We find these cases distinguishable on their facts.

In *Commissioner v. Southwest Exploration Co.*, *supra*, the Supreme Court held that landowners of property adjacent to an oil field who contributed the use of their land in return for a percentage of the net profits thereby acquired an economic interest in the oil in place. Under California law, offshore oil could only be extracted from filled lands or slant drilled from upland sites, and Southwest Exploration Co. had to provide satisfactory evidence of a present ability to drill from filled land or an upland site as a condition precedent to consideration of its lease request. Because the upland owners had the only property from which it was possible to drill for and produce the offshore oil, the upland owners had *total control* over whether or not the Southwest Exploration Co. could obtain a lease to drill and extract oil from the offshore deposit.

The taxpayer in *Oil City Sand & Gravel Co. v. Commissioner,* *supra,* operated two dredging facilities on the Allegheny River pursuant to Corps of Engineers permits which did not grant the taxpayer any interest in the minerals in place, and the taxpayer did not pay any fees or royalties with respect to its dredging operations. We found that the taxpayer had exclusive physical and economic control over the deposits it dredged: Because of low water, it was physically impossible for the taxpayer to dredge more than 1½ miles up or downstream from either facility; and there was no other suitable property adjacent to the deposits the taxpayer dredged from which another operator could compete with the taxpayer for the sand and gravel in the areas covered by taxpayer's operations. Based on these factors, we held that the taxpayer's physical and economic control of the dredging of sand and gravel in the areas adjacent to the taxpayer's riparian property made the taxpayer's real estate indispensable to its dredging operations and therefore under the rationale of *Commissioner v. Southwest Exploration Co., supra,* the taxpayer had an economic interest in the sand and gravel.

In *Victory Sand & Concrete, Inc. v. Commissioner, supra,* on facts similar to those in *Oil City,* we likewise held that the taxpayer had an economic interest in the sand and gravel deposits over which the taxpayer had exclusive physical and economic control. In *Victory Sand,* the taxpayer dredged State-owned sand pursuant to a contract with the State which required the taxpayer to pay a royalty on every ton of sand removed and sold.[7] State law provided that no other party was authorized to remove sand and gravel from the river within 1,500 feet of the taxpayer's operation, giving it the exclusive right to extract sand and gravel from the area designated in its permit.[8] We also found that there were no other sites suitable for profitable dredging operations within a reasonable dis-

---

[7] The taxpayer also operated pursuant to a permit, analogous to the Corps of Engineers permit in *Oil City,* which allowed the taxpayer to make changes in the bed and flow of the river within specified areas in the vicinity of the taxpayer's riparian property.

[8] We also noted that the taxpayer's investment was not all in depreciable equipment; the State surrendered to the taxpayer its interest in the sand and gravel that was removable by extraction; the sand and gravel following its removal belonged solely to the taxpayer; and the taxpayer had to look solely to the proceeds of its sales of sand and gravel for a return of its investment. See *Parsons v. Smith,* 359 U.S. 215 (1959).

tance of the taxpayer's operations which were not already in use for such.

We believe that the key to the *Southwest Exploration*, *Oil City*, and *Victory Sand* cases is that in each case the taxpayer had total control over production of the mineral. In *Southwest*, the upland owners' grant of the use of their land was a condition precedent to the granting of a permit to extract the offshore oil. Without the use of the upland owners' land, no oil could be extracted, nor could Southwest Exploration Co. have even obtained a permit to extract the offshore oil. In *Oil City*, the Court found that the taxpayer had exclusive physical and economic control of the sand deposits adjacent to its riparian properties. It was the combination of physical inaccessibility of the deposits, combined with the taxpayer's ownership of the only land from which those deposits could have been exploited, that gave the taxpayer an economic interest in the sand and gravel. A close reading of *Victory Sand* similarly indicates that the taxpayer had exclusive physical and economic control of the sand and gravel adjacent to its riparian properties.[9]

In the instant case, petitioner does not have exclusive physical and economic control of the sand and gravel adjacent to its riparian properties. Under these circumstances, it is possible that another operator could dredge materials from the deposits adjacent to petitioner's facilities with impunity.

For example, a contract dredger could dredge in the area adjacent to petitioner's properties, using land which is unsuited for a permanent facility but which is sufficient for the temporary storing of sand and gravel. Petitioner could not prevent the contract dredger from dredging in its deposits, since the right to dredge sand and gravel from the bed of the Missouri River is a public right, nor could petitioner obtain a royalty or other compensation for the sand and gravel extracted. Since contract dredgers typically extract huge quantities of sand and gravel, up to 2 million tons, the deposits which petitioner dredges could be substantially depleted by one of these contract dredgers and petitioner would be entirely unable to prohibit such operation or obtain any compensation. The economic reality is that without physical control over the deposits, petitioner could lose its sole source of the material to

---

[9]Pursuant to State law, the taxpayer had the exclusive right to extract minerals within 1,500 feet of its operations.

which it must look for income to a competing dredger who could remove a majority of the material without compensation to petitioner.

In general, we believe that only where a taxpayer has made a contribution of indispensable property in a situation where it has exclusive physical and economic control over sand and gravel deposits in the river adjacent to such property, so as to ensure that it alone will share in the proceeds from production of the adjacent minerals, can the taxpayer be considered to have an economic interest in the adjacent mineral property. Because petitioner did not have the requisite physical control over the sand and gravel in the riverbed adjacent to its riparian properties, it did not have an economic interest in such sand and gravel deposits, and therefore, it is not entitled to the claimed depletion deductions.[10]

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[10]See *Missouri Pacific Corp. v. United States*, Cl. Ct. No. 540–78 (May 10, 1984, 54 AFTR 2d 84–5157, 84–1 USTC par. 9474), in which the U.S. Claims Court reached a similar result with respect to another Missouri River commercial dredger.