HUSKY OIL COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21433–81.     Filed November 23, 1984.

*J. W. Bullion, Thornton Hardie III*, and *J. Y. Robb III*, for the petitioner.

*Marvin T. Scott* and *Byron Calderon*, for the respondent.

COHEN, *Judge*: Respondent determined deficiencies in petitioner's income taxes for 1975, 1976, and 1977 in the following amounts:

| Year | Amount |
| --- | --- |
| 1975 | $9,739 |
| 1976 | 142,570 |
| 1977 | 1,965,191 |

The first group of questions presented for determination arise out of petitioner's retirement of a bond issue in 1977. These questions are:

(1) Whether interest[1] of $753,280 paid by petitioner in 1977 to its parent on petitioner's debentures is deductible by petitioner;

(2) Whether the redemption premium of $1,082,999 paid by petitioner in 1977 to its parent is deductible by petitioner;

(3) Whether petitioner is entitled to deduct unamortized original issue costs of $624,590 upon the retirement of its debentures in 1977;

---

[1]The terms used to describe the payments and transactions are used for convenience; no inference with respect to the validity of petitioner's treatment of these terms should be drawn.

(4) Whether petitioner is entitled to deduct $355,135.24 of costs incurred in connection with the call of its debentures in 1977; and

(5) Whether the $1,082,999 premium petitioner paid to its parent to redeem its debentures is an item of income subject to withholding under section 1442.[2]

The final issue, referred to as the "Home-Stake issue," arises out of certain oil and gas activities of petitioner. The specific question for determination is whether petitioner is entitled to the deductions for depreciation and intangible drilling and development costs and to investment tax credits as claimed.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Husky Oil Co. (petitioner) is a corporation organized and existing under the laws of the State of Delaware. At the time of the filing of the petition in this case, and at all times relevant hereto, petitioner's principal office was located in Cody, WY. Petitioner maintains its books and records and files its consolidated annual returns for itself and its subsidiaries using the accrual method of accounting. It is on a calendar year for Federal income tax purposes. For each of the taxable years 1975, 1976, and 1977, petitioner filed a Form 1120, U.S. Corporation Income Tax Return, with the Internal Revenue Service at Ogden, UT.

During 1960, substantially all of the outstanding stock of petitioner was acquired by Husky Oil, Ltd., of Calgary, Alberta, a Canadian corporation. Husky Oil, Ltd., is hereinafter referred to as Husky Canada or as the parent. Since January 13, 1972, petitioner has been a wholly owned subsidiary of Husky Canada. The stock of Husky Canada was, during the years at issue, and is at present, listed on the American and Toronto Stock Exchanges.

Petitioner operates an integrated oil and gas business in the United States and, through its subsidiaries, conducts an oil

---

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

and gas business in foreign countries. Husky Canada conducts an integrated oil and gas business in Canada.

## The Debenture Issues

On January 13, 1972, petitioner offered to the public $25 million of 6¼-percent convertible subordinated debentures dated January 15, 1972, and maturing on January 15, 1997. The debentures were offered and issued under an indenture, the parties to which were petitioner, Husky Canada, and Bankers Trust Co., as trustee. During January 1972, petitioner sold the entire offering, incurring underwriting discounts and commissions of $500,000 and other expenses of $360,000 and realizing net proceeds of $24,140,000. Until 1977, petitioner amortized the original issue costs of $860,000 over the term of the debentures.

The debentures were issued in denominations of $1,000 and integral multiples thereof. They were unconditionally guaranteed by Husky Canada and convertible into the common stock of Husky Canada at an initial price of $20 per share, which price was subject to adjustment for certain contingencies not here relevant. The debentures were convertible at any time up to and including the maturity date. In the event of a call for redemption, however, such privilege terminated at the close of business on the 15th day prior to the redemption date. Conversion, if elected by the holder of the bond, was to be accomplished by surrender of the debenture to the guarantor/ parent at the office or agency maintained by the parent and petitioner. Husky Canada agreed to retain sufficient stock for the purposes of delivery upon conversion.

In addition to the terms outlined above, the indenture provided, inter alia:

Section 2.03. The Debentures shall be issuable as registered Debentures without coupons, in denominations of $1,000 and any multiple of $1,000. The Debentures shall be dated the date of authentication, and shall bear interest from the 15th day of January or July, as the case may be, to which interest has been paid last preceding the date thereof, unless such date is a January 15th or July 15th on which interest has been paid, in which case they shall bear interest from such date, or unless such date is prior to the first payment

of interest, in which case they shall bear interest from January 15, 1972. * * *

* * * * * * *

Section 2.08. All Debentures surrendered for the purpose of payment, redemption, conversion, exchange, substitution or registration of transfer, or in discharge in whole or in part of any Sinking Fund payment, shall, if surrendered to the Company [petitioner] or any paying agent, be delivered to the Trustee for cancellation, or, if surrendered to the Trustee, shall be cancelled by it, and no Debentures shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Indenture. The Trustee shall destroy cancelled Debentures and shall deliver a certificate of destruction thereof to the Company. If the Company or the Guarantor shall acquire any of the Debentures, however, such acquisition shall not operate as a redemption or satisfaction of the indebtedness represented by such Debentures unless and until the same are surrendered to the Trustee for cancellation.

* * * * * * *

Section 4.01. * * * the Company may, at its option, at any time prior to maturity redeem all, or from time to time any part, of the Debentures, otherwise than through the operation of the Sinking Fund provided for in this Article Four, in each case at the redemption price then applicable thereto, as specified in the form of Debenture hereinbefore set forth, for redemption otherwise than through the operation of the Sinking Fund.

* * * * * * *

Section 4.03. If the giving of notice of redemption shall have been completed as above provided, the Debentures or portions of Debentures specified in such notice shall become due and payable on the date and at the place stated in such notice at the applicable redemption price, together with interest accrued to the date fixed for redemption, and on and after such date fixed for redemption * * * interest on the Debentures or portion of Debentures so called for redemption shall cease to accrue, * * * and any right to convert the principal of the Debentures or portions of Debentures so called for redemption shall terminate at the close of business on the fifteenth day prior to said date * * *. On presentation and surrender of such Debentures at said place of payment in said notice specified, the said Debentures shall be paid and redeemed by the Company at the applicable redemption price, together with interest accrued to the date fixed for redemption.

* * * * * * *

Section 5.01. The holder of any Debenture shall have the right, at his option, at any time up to and including January 15, 1997 * * * to convert, subject to the terms and provisions of this Article Five, the principal of any

such Debenture, or any portion thereof which is $1,000 or a multiple thereof in amount, into shares of Common Stock of the Guarantor, at the price per share specified in the form of Debenture hereinbefore set forth, or, in case an adjustment of such price has taken place pursuant to the provisions of Section 5.04, then at the price as last adjusted (referred to herein as the "conversion price"), upon surrender of the Debenture, the principal of which is so to be converted, to the Guarantor at any time during usual business hours at the office or agency to be maintained by it in accordance with the provisions of Section 6.02, together with written notice of election to convert * * *

  *   *   *   *   *   *   *

Section 5.03. No adjustments in respect of interest or dividends shall be made upon the conversion of any Debenture or Debentures; *provided, however*, that nothing contained herein shall alter or impair the obligation of the Company [petitioner] to pay interest on any Debenture on any interest payment date notwithstanding the conversion of such Debenture between the close of business on the record date next preceding such interest payment date and such interest payment date.

  *   *   *   *   *   *   *

Section 5.11. All Debentures delivered to the Guarantor upon conversion pursuant to this Article Five (hereinafter in this Section 5.11 called "Converted Debentures") shall be imprinted with a legend indicating such conversion and held by the Guarantor, and may, at any time at the discretion of the Guarantor, be surrendered to the Trustee for cancellation. Converted Debentures shall not be further convertible into Common Stock, and shall not be redeemable, whether by operation of the Sinking Fund provided for in Article Four or otherwise, unless all Debentures at the time outstanding held by persons other than the Guarantor shall be redeemed at the same time. The Guarantor may extend or consent to the extension of the time for the payment of interest, and may waive interest on all or any Debentures held by it.

The Indebtedness evidenced by Converted Debentures, including the principal thereof and premium, if any, and interest thereon, and the Guarantee thereof, shall be subordinated and subject in right of payment to all other Debentures, to the same extent and in the same manner that the indebtedness evidenced by the Debentures is subordinate and subject in right of payment to Senior Indebtedness, all as set forth in Article Three of this Indenture.

The debentures were redeemable at petitioner's option on not less than 30 nor more than 60 days' notice. Upon redemption, 100 percent of the principal amount, plus accrued interest to the redemption date, was to be paid. If the debentures were redeemed prior to June 15, 1992, the redemp-

tion price to be paid included a premium as established in accordance with a schedule set forth in the indenture.

Out of debentures in the principal amount of $797,000 converted to Husky Canada stock during 1973, debentures in the principal amount of $86,000 were contributed by the parent to the capital of petitioner. The remaining principal amount of $711,000 for 1973 and the principal amount of $218,000 of debentures converted during 1974 were credited by petitioner to the intercompany account payable to the parent in the total amount of $929,000. The entire intercompany account payable, including the sum of $929,000, attributable to the converted debentures, was deemed satisfied by both petitioner and Husky Canada on August 1, 1975, petitioner's issuance of its common stock to the parent.

During 1974 and 1975, petitioner retired, by purchase, debentures in the amount of $795,000.

Between January 1, 1975, and May 31, 1977, $1,136,000 of debentures were converted to the parent's common stock. These debentures remained in the hands of Husky Canada and were not delivered to the trustee for cancellation.

The above-described debenture transactions are summarized below:

| Debentures | | Purchased by petitioner | Converted | Outstanding and publicly held |
|---|---|---|---|---|
| Issued January | 1972 | | | $25,000,000 |
| | 1973 | | $797,000 | 24,203,000 |
| | 1974 | $500,000 | 218,000 | 23,485,000 |
| | 1975 | 295,000 | 715,000 | 22,475,000 |
| | 1976 | | 380,000 | 22,095,000 |
| Jan. 1–June 1 | 1977 | | 41,000 | 22,054,000 |
| Totals | | 795,000 | 2,151,000 | |

On January 1, 1977, petitioner gave notice of its election to redeem on July 1, 1977, all of its outstanding 6¼-percent convertible debentures due in 1997. For each $1,000 principal amount of debentures, the redemption price was $1,046.80 (principal plus a 4.68-percent premium as set forth in the schedule in the indenture), plus $28.60 accrued interest from January 15, 1977, to July 1, 1977, the redemption date. Thus, the total redemption price, plus accrued interest, was $1,075.40.

On June 1, 1977, $22,054,000 of the 6¼-percent debentures were outstanding in the hands of the public. According to the terms of the original offering of the debentures, the holders had until the close of business on June 16, 1977, to exercise their conversion rights in lieu of redemption. The market price of parent's common stock as of May 31, 1977, was $25.50 per share. Conversion at a rate of 50 shares per $1,000 debenture would result in $1,275 worth of stock for each $1,000 debenture. The Husky Canada shares issued to consummate the conversion were authorized but unissued shares, with a basis of zero prior to issuance in connection with the conversion of the debentures.

In connection with the call of the debentures for redemption, petitioner and Husky Canada entered into a standby agreement with Lehman Bros., Inc., Pittfield Mackay & Co., Inc., and Wood Gundy Inc. (the standby purchasers), as representatives of themselves and other purchasers, under which the standby purchasers agreed to purchase all debentures delivered to them at a flat price of $1,080 for each $1,000 principal amount (an amount slightly in excess of the redemption price plus accrued interest). Each standby purchaser was obligated to convert the debentures purchased by it. Petitioner paid a fee of $264,648 for the standby agreement and paid $17,661.80 in advertising costs to notify bondholders of their option to have the debentures purchased pursuant to the standby agreement. No debentures were acquired by the standby purchasers.

By the close of business on June 16, 1977, debentures with a face value of $22,005,000 had been converted into common stock of the parent. The debentures were in the possession of Bankers Trust Co. on July 1, 1977. While the debentures had not been canceled, they were not registered in the name of a new registered owner subsequent to conversion.

By letter dated August 3, 1977, Husky Canada requested Bankers Trust Co., as trustee, to cancel the debentures. By letter dated September 9, 1977, the trustee confirmed that it had done so.

On July 1, 1977, petitioner redeemed the remaining $49,000 of debentures by payment of $52,694 in cash from its own funds, computed by petitioner as follows:

| | |
|---|---:|
| Principal amount | $49,000 |
| Premium: 4.68% of $49,000 | 2,293 |
| Actual interest of 2.86% of $49,000 | 1,401 |
| Total payment | 52,694 |

The conversion/redemption of the debentures in the principal amount of $25 million in the hands of public holders described above is summarized below:

| | |
|---|---:|
| Purchased by petitioner using its own funds | $795,000 |
| Converted 1973 and contributed by Husky Canada to the capital of petitioner | 86,000 |
| Converted 1973 and 1974 and exchanged for petitioner's stock on Aug. 1, 1975 | 929,000 |
| Converted Jan. 1, 1975 to June 1, 1977 | 1,136,000 |
| Converted June 1 to June 17, 1977 | 22,005,000 |
| Subject to redemption call on July 1, 1977, and redeemed by petitioner using its own funds | 49,000 |
| Total | 25,000,000 |

On July 1, 1977, petitioner issued two 5-percent subordinated notes to Husky Canada due July 1, 1982, one in the amount of $22,005,000, and another in the amount of $1,136,000. The note in the amount of $1,136,000 was issued to Husky Canada in connection with the debentures converted into its common shares from January 1, 1975, to June 1, 1977, the principal amount of which was $1,136,000. The note in the amount of $22,005,000 was issued to Husky Canada in connection with the debentures converted into its common shares from June 1, 1977, to the close of business on June 16, 1977, the principal amount of which was $22,005,000.

No interest was accrued as a liability on the books of petitioner prior to June 30, 1977, in respect of debentures held by Husky Canada. Petitioner computed interest and premium allegedly due on the principal amount of $22,005,000 (the principal amount of debentures held by the public that were converted June 1, 1977, through June 16, 1977) and the interest and premium allegedly due on the principal amount of $1,136,000 (the principal amount of the debenture held by the public that were converted between January 1, 1975, and May 31, 1977), as follows:

| *Debentures held by public, converted June 1 through June 16, 1977, principal amount $22,005,000* | *Premium and interest* |
|---|---:|
| Premium 4.68% of $22,005,000 | $1,029,834 |
| Interest Jan. 16 to June 16, 1977, 2.603% of $22,005,000 | 572,790 |
| Interest June 16 to July 1, 1977, .257% of $22,005,000 | 56,553 |
| Subtotals | 1,659,177 |
| *Debentures converted from Apr. 2, 1975 to May 11, 1977, principal amount $1,136,000* | |
| Premium 4.68% of $1,136,000 | 53,165 |
| Interest from date of conversion to Jan. 15, 1977 | 88,437 |
| Interest from Jan. 15 to July 1, 1977, 3.125% of $1,136,000 | 35,500 |
| Subtotals | 177,102 |
| Grand totals | 1,836,279 |
| Total amount deemed due by petitioner to Husky Canada | 1,836,279 |
| Less 15% withholding on the total interest of $753,280 from above | 112,992 |
| Amount ultimately paid by petitioner to Husky Canada | 1,723,287 |

By letter dated July 25, 1977, petitioner directed Continental Illinois National Bank & Trust Co. of Chicago to transfer $1,560,837 from its account to the account of Husky Canada. This transfer of funds was made on July 29, 1977. In addition, an adjusting payment of $162,450 was made by petitioner to Husky Canada on August 4, 1977.

On its 1977 return, petitioner deducted $625,913, which was the unamortized balance remaining on the 6¼-percent debenture issue costs; premium and interest of $1,836,279 paid to Husky Canada upon converted debentures; premium and interest of $3,694 paid upon convertible debentures offered for redemption; legal fees and other incidental conversion charges of $90,487; the standby agreement fee of $264,648; and accrued interest of $578,525 due to Husky Canada on the promissory notes. These items totaled $3,399,546.

Of these amounts, respondent allowed the deduction of $3,694 paid as interest and premium on the bonds directly

surrendered to petitioner for redemption and allowed petitioner to deduct the portion of unamortized issue costs ($1,323) attributable thereto. Respondent disallowed the remaining $3,394,529 claimed by petitioner.

In January 1978, petitioner paid its parent company the accrued interest of $578,525 less withholding tax of $86,778.75 for a net payment to Husky Canada of $491,746.25. On February 17, 1978, petitioner's board of directors adopted a resolution authorizing the issuance of 349,834 shares of its stock to Husky Canada in satisfaction of its indebtedness to Husky Canada as of January 2, 1978, in the amount of $24,058,084. This amount included $578,525 that had previously been paid to Husky Canada by petitioner as interest on its notes. The effect of this resolution was to reverse payment by petitioner of the interest on the promissory notes to Husky Canada, including withholding tax that had been paid to petitioner's bank. During August 1978, Husky Canada repaid the net interest it had received from petitioner in the amount of $491,746.25. Petitioner also applied for a refund of $86,778.75 of Federal withholding taxes that it had deposited in payment of its foreign withholding taxes as shown on its Form 1042 for 1978.

The parties have stipulated that if any amounts deducted by petitioner should be determined by the Court to be a part of the cost of the two 5-percent notes, in accordance with one of the positions being taken by respondent, then petitioner would be entitled to a ratable portion of the amortization for the period of 6 months in 1977 during which said notes were outstanding. The ratable portion is six-sixtieths of whatever may be capitalized as a part of the 5-percent notes. This stipulation is based on the facts as viewed from the close of the taxable year 1977 and in no way prejudices respondent's right to subsequently recharacterize this transaction in view of matters that occurred during 1978 or subsequent thereto.

### Withholding on Premium

During July and August of 1977, petitioner made cash payments totaling $1,082,999 to Husky Canada, which was paid as redemption premium on the retired bonds. In his notice of deficiency, respondent determined that this amount

represents an item of income subject to withholding tax under section 1442.

## The Home-Stake Issue

Home-Stake Production Co. (Home-Stake) was organized in 1955, and in 1956 began selling interests in oil and gas ventures to the public. Starting in 1964, the interests were sold as public offerings and were registered with the Securities and Exchange Commission. Each of the public offerings from 1964 through 1969 was made by a different program operating corporation, each a wholly owned subsidiary of Home-Stake, each with the same offices, officers, and directors as the parent company, and each incorporated for the purpose of making the offerings. In each of the programs, investors were offered "units of participation" representing direct ownership of working interests in oil and gas leases.

In return for their investments in the programs, the investors (or participants) were to receive the full net proceeds of each well after the wells began to produce, until such time as the participants had recovered their initial investments. Thereafter, a 20-percent (or 25-percent, depending on the program) working interest was to revert to Home-Stake. The agreement with Home-Stake by which each participant made his investment provided that the participant was purchasing not only a unit in the program but also the proportionate working interest in the underlying oil and gas leases.

On September 20, 1973, Home-Stake filed a voluntary petition in the U.S. District Court for the Northern District of Oklahoma asking for reorganization under the prevailing bankruptcy laws. The program operating corporations followed Home-Stake into reorganization on October 5, 1973. The court appointed Royce H. Savage (Savage) trustee.

On June 3, 1974, Home-Stake, the Home-Stake program operating corporations, petitioner, Savage, and the participants entered into an agreement that delineated the various rights, interests, and obligations of each party with respect to the oil and gas leases comprising the Home-Stake programs. The agreement was approved by an order of the court of June 28, 1974, and supplemented by another District Court order filed March 11, 1977. The agreement divided the oil and gas leases into two groups, referred to as Unit Area A and Unit

Area B. Because the controversy herein concerns deductions taken with respect to Unit Area A, we limit our findings to matters pertaining to Unit Area A.

Petitioner agreed to act as operator of the subject leases, making all decisions with respect to the properties; to pay all operating costs, rents, and royalties; to make all necessary capital expenditures; to purchase or sell all oil and gas produced; and to hold all of the interests of the participants in the leases, in trust, for the benefit of the participants and itself, as of the time it also became a participant.

After paying all rents and royalties from the proceeds of the leases, petitioner was entitled to apply 75 percent of the balance of the net proceeds to reimburse itself for operating expenses, such as the costs of removing the oil and gas, taxes, and insurance costs. The remaining 25 percent, and any part of the 75 percent not paid as reimbursement, was distributed to the participants. If operating revenues were insufficient in any month to repay petitioner, the deficiencies were carried over to the next month for payment. Petitioner could look only to the net revenues of production for repayment.

Petitioner also agreed to make all capital expenditures necessitated by the operation, maintenance, and development of Unit Area A. Petitioner was not to be repaid for the first $3 million so expended but could thereby also become a participant. Specifically, for each $750,000 spent on capital costs, such as drilling wells, putting in flow lines, leasing equipment, and purchasing equipment, petitioner acquired an undivided 5-percent interest in the rights held by the participants. Through capital expenditures, petitioner earned its first 5-percent interest in Unit Area A on June 1, 1975; the second 5-percent interest on November 1, 1975; the third 5-percent interest on August 1, 1976; and the fourth 5-percent interest on December 1, 1978. Thus, any distributions payable to participants included petitioner to the extent of its participating interest at the time.

After petitioner had paid $3 million in capital expenditures, each participant could then elect to begin paying his or her proportionate share of capital costs. If a participant chose not to pay, he could not later elect to pay, although a contributing participant could later elect to stop paying. To the extent that the capital costs were not paid by participants, petitioner was

obligated to pay them. The tax credits attributable to these costs were allocated to petitioner and contributing participants in accordance with their contributions.

Any contributing participant was entitled to recover 150 percent of the amounts expended for capital costs. Sums owed to petitioner (for capital expenditures beyond the initial $3 million) or participants for reimbursement for capital expenditures were paid from the balance, if any, of the 75 percent of net revenues used to repay operating expenses. Again, any amounts remaining after reimbursement were distributed to the participants. Every $8 million distributed to participants after petitioner had contributed the initial $3 million in capital expenditures would earn petitioner an additional 10-percent participating interest until petitioner owned 50 percent of the participating rights of Unit Area A.

On its returns for 1975, 1976, and 1977, petitioner deducted amounts attributable to intangible drilling and development costs and depreciation. Petitioner also claimed an investment tax credit for amounts expended on Unit Area A for each of those years. In his notice of deficiency, respondent reduced the amount of deductions and investment tax credit allowed with respect to Unit Area A to correspond to petitioner's participating interest in Unit Area A for the tax year in question.

OPINION

### The Debenture Issue

Respondent's denial of petitioner's deduction of the amounts paid to its parent as interest and premium on the converted debentures is based upon respondent's determination that petitioner was not legally obligated to make these payments. Petitioner contends that section 5.11 of the indenture requires petitioner to pay redemption premium and interest on the converted debentures to Husky Canada. Petitioner points out that this section (1) distinguishes between debentures that have been offered for conversion (converted debentures) and debentures that have not been offered for conversion (debentures), (2) contemplates that Husky Canada may hold converted debentures, and (3) tells us when converted debentures may be redeemable. Petitioner then refers to the language of section 5.11 that says that Husky Canada "may extend or consent to the

extension of time for the payment of interest, and may waive interest on all or any Debentures held by it." Petitioner argues that all of this means that converted debentures and debentures held by Husky Canada were not fully performed debentures.

Petitioner finds further support for its argument that converted debentures were not fully performed debentures in the closing sentence of section 5.11. That provision subordinates the indebtedness represented by the converted debentures, including the principal thereof and premium, if any, and interest upon that indebtedness, to the indebtedness represented by the debentures. Petitioner contends that the specific subordination of the debt of the converted debentures in the indenture proves the existence of the debt and concludes that because the converted debentures remained an outstanding indebtedness of petitioner in the hands of Husky Canada, Husky Canada merely substituted for the original debenture holders as a creditor of petitioner and was entitled to the same premium and interest payments as the public holders of the debentures.

There is a gap in the logic of petitioner's syllogism, however. Section 163 provides that, as a general rule, "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Interest is defined as compensation for the use or forbearance of money. *Deputy v. du Pont*, 308 U.S. 488 (1940). Before such compensation constitutes interest, however, there must be an existing, valid, and enforceable obligation to pay a principal sum. *Old Colony R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932). The obligation to pay interest on an indebtedness is separate from the obligation to repay the indebtedness, and petitioner must have both obligations before the interest paid is deductible.[3] *D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776, 805–806 (1960), affd. 296 F.2d 732 (6th Cir. 1961).

In *Tandy Corp. v. United States*, 626 F.2d 1186, 1190 (5th Cir. 1980), the Court of Appeals for the Fifth Circuit, which was construing an indenture similar to the indenture in the present case, made the following helpful observation:

---

[3]Under sec. 1.163–4(c), Income Tax Regs., when debentures are issued by a corporation and are subsequently repurchased at a price in excess of their issue price, the excess of the repurchase price over the issue price (premium) is currently deductible as interest, except as limited by sec. 249. Sec. 249 limits the premium deduction allowed on a convertible debt security to a "normal call premium," which is defined by sec. 1.249–1(d)(2), Income Tax Regs., as an amount not in excess of 1 year's interest.

The process of construing a debenture indenture, in this case a 95-page instrument, calls to mind the story of the blind men who were asked to describe the elephant. The moral of that story is that in order correctly to describe an elephant, it is necessary to get a feel for the whole elephant, and the same principle applies to the construction of a debenture indenture.

Thus, it distorts the meaning of the indenture to isolate section 5.11, which is only intended to subordinate the debt of converted debentures and attendant obligations, if any, to the debt of all other debentures, and conclude that by the reference to interest and premium on converted debentures contained in section 5.11, the indenture requires petitioner to pay interest and premium on converted debentures. The only part of that section that refers to an already-formed right to receive interest is the provision allowing Husky Canada to waive or extend the time for collection of interest and that interest is on *debentures*, which Husky Canada could have acquired by purchase, and not interest on *converted debentures*.

The right to receive interest and premium is found in sections 2.03 and 4.03 of the indenture, which both refer to rights of public holders of *debentures* and not the right of Husky Canada as a holder of converted debentures. These provisions also must be read in the context of the entire 105-page indenture, however, so we must also consider public debenture holders' other rights under the indenture, specifically their conversion rights under article five of the indenture, and the effect of the exercise of these conversion rights upon the right to receive interest and premium.

Respondent, while contending that the entire indenture supports his argument that petitioner had no obligation to pay the disputed interest and premium, specifically refers to section 5.03, known as a "no adjustment" clause, in support of his claim that the conversion extinquished petitioner's obligation to pay interest and redemption premium. Petitioner claims that this provision means only that the converting debenture holder is not entitled to interest, but the debenture still continues to accrue interest and the substituted creditor, Husky Canada, is the party entitled to receive it. Petitioner has understated the effect of conversion upon the debentures and the importance of the "no adjustment" clause, however.

Two decisions have addressed the deductibility of amounts paid as interest on debentures offered for conversion. In *Scott Paper*

*Co. v. Commissioner*, 74 T.C. 137 (1980), we were asked to decide whether the stock transferred by Scott Paper Co. (Scott) upon the conversion of its debentures was transferred in exchange for the converted debentures plus the amount of interest accrued thereon during an incomplete interest period or in exchange for only the converted debentures. The debentures had been issued pursuant to an indenture that obligated Scott to pay interest semiannually to the debenture holders of record on the interest payment date and empowered the debenture holders to elect to convert their debentures into shares of Scott common stock at a predetermined rate. The Commissioner disallowed deductions for the interest accrued on bonds that were converted prior to the completion of the interest payment period. Scott argued that the interest accrued on its convertible debentures during the incomplete interest period was paid by the issuance of stock at the time of conversion.

In holding that Scott had not paid interest to the debenture holders upon the conversion, we distinguished three earlier cases that permitted interest deductions upon stock-for-debenture exchanges (*Hummel-Ross Fibre Corp. v. Commissioner*, 40 B.T.A. 821 (1939); *Shamrock Oil & Gas Co. v. Commissioner*, 42 B.T.A. 1016 (1940); *Central Electric & Telephone Co. v. Commissioner*, 47 B.T.A. 434 (1942)) because in each of those cases the Board of Tax Appeals found that accrued interest was owing and was actually paid. None of those cases involved convertible debentures. Instead, the debenture holders in those cases agreed to exchange their debentures for stock or new debentures pursuant to a newly struck bargain designed to enable the issuing company to retire its outstanding debentures and past-due interest obligations. In *Scott Paper Co. v. Commissioner, supra*, as in the instant case, the terms of conversion were established when the debentures were issued, and such terms remained in effect during the exchange. In neither *Scott* nor in the instant case had all events entitling debenture holders to earn interest occurred when the debentures were converted. Thus, the shares of stock were issued only in exchange for the principal amount of the debentures.

In material respects, the present case is factually indistinguishable from *Tandy Corp. v. United States, supra*. In that case, the taxpayer-corporation (Tandy) issued a debenture convertible into its common stock. The indenture provided

Tandy with the option to redeem the debentures by paying the applicable percentage of the principal amount, which included a premium in the year of Tandy's call for redemption, together with accrued interest to the redemption date on all debentures offered for redemption on the specified redemption date. The indenture also provided the debenture holders with the option to convert their debentures into common stock at a predetermined price per share. Like the conversion provision of section 5.01 of petitioner's indenture, the conversion provisions in *Tandy* did not provide for augmenting the principal amount of the debenture by either accrued interest or bond premium. In addition, the indenture had the same "no adjustment" clause found in section 5.03 of the indenture herein.

When Tandy called the bonds for redemption, the favorable market price of its stock had the effect of forcing a conversion. On its return, Tandy deducted that portion of the value of the stock exchanged for debentures that it attributed to payment of accrued interest and debenture premium.

In holding that these amounts were not deductible, the Court of Appeals for the Fifth Circuit examined Tandy's contractual obligations under the indenture. The court determined that Tandy was obligated to pay accrued interest and redemption premium only to debenture holders who held their debentures on the redemption date; the "no adjustment" clause in the indenture specifically negated any obligation of Tandy to pay accrued interest and premium upon converted debentures. Tandy was only obligated to pay interest and redemption premium to holders of convertible debentures who actually surrendered the debentures for redemption. 626 F.2d at 1191.

The petitioner herein argues that *Tandy* and the cases cited therein are inapplicable because the debentures were converted into Husky Canada's stock and not petitioner's. Petitioner also argues at length that the conversion had no effect on the debentures' status as an outstanding debt obligation of petitioner's because Husky Canada, not petitioner, had acquired the debentures. With this latter point, we agree. Respondent contends that under the indenture, a converted debenture is a fully performed debenture and that petitioner has no remaining obligation with respect to such instrument. This theory overlooks the fact that petitioner has received almost $25

million of financing at relatively little cost. It also overlooks section 5.11 of the indenture. The language in section 5.11 that refers to the subordination of the "indebtedness evidenced by the Converted Debentures," when read in the context of the entire indenture, evinces an intention by the parties to the indenture to accord to petitioner an obligation to repay the principal represented by the converted debentures.

Our conclusion that a debt remained outstanding does not mean that the conversion had no effect on the debentures, however. The holder of a convertible debenture has alternative contractual rights—he may demand payment of the debenture, or he may demand shares of stock in accordance with the conversion privilege. When performance of one of the issuer's obligations to a holder of a convertible debenture is demanded and completed, the alternative obligation is discharged. *AMF, Inc. v. United States*, 201 Ct. Cl. 338, 476 F.2d 1351 (1973); *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971). The election by the holder of a convertible debenture called for redemption to convert such debenture into common stock extinguishes the issuer's obligation to pay those components of the redemption price consisting of accrued interest and debenture premium. *Tandy Corp. v. United States*, *supra* at 1193. The fact that the bonds were converted into Husky Canada's shares and not petitioner's does not alter the above-explained rights under the indenture. The converted debentures in the hands of Husky Canada represent merely the right to the underlying principal amount, and that is all that petitioner owed its parent. Petitioner cannot, therefore, deduct the amounts paid as "interest" on the converted debentures.

Because the principal amount of the converted debentures remained outstanding as a debt obligation of petitioner to its parent after the conversion, the interest accrued on the 5-year notes given in satisfaction of that obligation is deductible under section 163(a). The amount thus deductible during 1977 is $578,525.

*Unamortized Original Issue Costs and Costs Relating to the Call and Conversion of the Debentures*

Petitioner contends that because the debentures were retired in 1977, it should be able to deduct its remaining

unamortized costs of issuing the bonds. In support of its contention, petitioner cites *Bridgeport Hydraulic Co. v. Commissioner*, 22 T.C. 215 (1954), affd. 223 F.2d 925 (2d Cir. 1955). Petitioner overlooks the fact, however, that the taxpayer in *Bridgeport* retired its debt by a cash payment. The subsequent issuance of new debentures to raise cash was found to be an independent transaction and that finding distinguished the situation in *Bridgeport* from the Supreme Court's holding in *Great Western Power Co. v. Commissioner*, 297 U.S. 543 (1936). In the present case, petitioner issued promissory notes to Husky Canada to retire the principal amount of the debentures, which puts petitioner directly within the ambit of *Great Western*.

The Supreme Court held in *Great Western* that when there is "an exchange of one obligation for another which is to be retired * * * [t]he remaining unamortized expenses of issue of the original bonds and the expense of the exchange are both expenses attributable to the issuance of the new * * * [obligation] and should be treated as a part of the cost of obtaining the loan. They should, accordingly, be amortized annually throughout the term of the * * * [obligations] delivered in exchange for those retired." 297 U.S. at 546–547. See also *Southwest Grease & Oil Co. v. United States*, 435 F.2d 675 (10th Cir. 1971).

In the present case, petitioner seeks to deduct costs that, under *Great Western*, must be amortized over the term of 5-year notes. These amounts include not only the unamortized original issue costs but also all the other costs attendant to the redemption, including the legal fees, the cost of the notice of redemption, the standby agreement, and the cost of advertising the availability of the standby agreement. Petitioner's attempts to characterize the cost of the standby agreement as a deductible loss under section 165 are unpersuasive. Although the value of the agreement to petitioner after all the debentures had been converted may have been zero, the agreement was entered to help relieve petitioner of its financial obligations in the redemption and was an expense of the redemption.[4]

---

[4] See also *Kisska v. Commissioner*, T.C. Memo. 1981–655.

## Withholding on Premium

Section 1442(a) provides that in the case of payments to a foreign corporation, "there shall be deducted and withheld at the source in the same manner and on the same items of income as is provided in section 1441 or section 1451 a tax equal to 30 percent" of the income. Section 1441(b) provides a listing of the types of items subject to withholding. These items include "interest, * * * dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains."

Respondent determined that the amounts paid by petitioner as debenture premiums were subject to withholding under section 1442. Petitioner's objection to this determination was predicated on its contention that the term "premiums" as used in section 1441 refers to insurance premiums and not debenture premiums. We have determined that petitioner's characterization of the payment as debenture premium is incorrect. Therefore, we need not decide whether section 1441 applies to debenture premiums. Inasmuch as petitioner has failed to introduce any evidence or other argument that would exclude the payment from the purview of section 1442, respondent's determination on that issue is sustained.

## The Home-Stake Issue

The parties agree that petitioner's right, if any, to the deductions and credits in dispute is controlled by the application of section 1.612–4, Income Tax Regs., which provides:

(a) *Option with respect to intangible drilling and development costs.* In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expenses. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas. Such expenditures have for convenience been termed intangible drilling and development costs. * * *

*     *     *     *     *     *     *

Included in this option are all costs of drilling and development undertaken (directly or through a contract) by an operator of an oil and gas property whether incurred by him prior or subsequent to the formal grant or assignment to him of operating rights (a leasehold interest, or other form of operating rights, or working interest); except that in any case where any drilling or development project is undertaken for the grant or assignment of a fraction of the operating rights, only that part of the costs thereof which is attributable to such fractional interest is within this option. In the excepted cases, costs of the project· undertaken, including depreciable equipment furnished, to the extent allocable to fractions of the operating rights held by others, must be capitalized as the depletable capital cost of the fractional interest thus acquired.

The parties also rely on the same authority, *United States v. Cocke*, 399 F.2d 433 (5th Cir. 1968), in support of their respective positions.

Respondent contends that under the agreement, the petitioner acquired from the participants only a fraction of the operating rights—specifically, 5 percent for each $750,000 in capital contributions—and that therefore petitioner must capitalize its intangible drilling and development costs attributable to the percentage retained by the participants. Respondent also contends that petitioner's entitlement to the claimed investment credit and depreciation deductions is similarly limited to petitioner's percentage share of the participating rights. Petitioner argues that the agreement assigned all of the operating rights to petitioner and that petitioner had a working interest in Unit Area A that entitled it to elect to deduct the intangible drilling and development costs currently and to claim all of the depreciation deductions and investment credit attributable to Unit Area A for each of the years in issue.

The critical question, therefore, is what interests did petitioner acquire under the agreement? Respondent agrees that petitioner was obligated to and did pay all of the operating expenses and capital costs of Unit Area A during the years in issue. He still argues, however, that the working interest was retained by the participants during this time and only acquired incrementally by petitioner through capital expenditures and that, therefore, only a proportionate part of the total expenditures may be deducted by petitioner.

Respondent points out that at the beginning of the years in issue, petitioner did not own any part of the underlying leases and only owned as much as 5 percent by the end of 1977. That

fact does not necessarily subvert the propriety of petitioner's deductions, however. As early as 1925, the Supreme Court realized that where natural resources are concerned, the refinement of legal title is not the determining factor in allocating tax deductions.

It is said that the depletion allowance applies to the physical exhaustion of the ore deposits, and since the title thereto is in the lessor, he alone is entitled to make the deduction. But the fallacy in the syllogism is plain. The deduction for depletion in the case of mines is a special application of the general rule of the statute allowing a deduction for exhaustion of property. While respondent does not own the ore deposits, its right to mine and remove the ore and reduce it to possession and ownership is property within the meaning of the general provision. Obviously, as the process goes on, this property interest of the lessee in the mines is lessened from year to year, as the owner's property interest in the same mines is likewise lessened. There is an exhaustion of property in the one case as in the other * * * [*Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925).]

Similarly, in *Burnet v. Harmel*, 287 U.S. 103 (1932), the Court again ruled that the "economic consequences," rather than the conclusory characterizations of local land law, govern the taxation of a bonus paid for a mineral lease.

Finally, in *Palmer v. Bender*, 287 U.S. 551 (1933), the Supreme Court laid to rest distinctions based on legal title and adopted the "economic interest" test in determining who was entitled to depletion deductions. The test for ascertaining whether a taxpayer possesses an economic interest in the natural resources is whether the taxpayer has (1) acquired by investment an interest in the mineral in place, and (2) whether he looks to the income from the extraction of the materials for a return of his investment. *Palmer v. Bender, supra* at 557. See also *Missouri River Sand Co. v. Commissioner*, 83 T.C. 193 (1984). "By this is meant only that under his contract he must look to the oil in place as the source of the return of his capital investment." *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 603 (1946). The economic interest test is now embodied in section 1.611–1(b)(1), Income Tax Regs. "[T]he office of the economic interest [is] to identify the party to whom benefits and burdens attendant to mineral production are to be attributed for tax purposes." *Weinert's Estate v. Commissioner*, 294 F.2d 750, 755 (5th Cir. 1961).

In *United States v. Cocke, supra*, the economic interest test was applied in a "carried interest" situation for determining

the party entitled to deduct intangible drilling and development costs, depletion, and depreciation.

In any carried interest transaction, one of the owners of the working interest in property is willing to advance the funds necessary for drilling of wells and development of production of oil or gas, and to look only to the other owner's share of production for the other owner's contribution to such costs. The party who puts up the money is called the carrying party because he risks his entire investment against the possibility that there will not be enough production to reimburse him for his costs. The other party is called the carried party because he takes no risks. The carried party agrees to wait until the carrying party has recouped his drilling and development costs out of production before he takes any payments on his share. The carried party is not personally liable for any costs and loses nothing if there is no production. [*United States v. Cocke, supra* at 436.]

In *Cocke*, the taxpayers, along with another individual and Humble Oil & Refining Co. (Humble), owned oil and gas leases. The parties executed agreements that designated Humble as the operator of the leases and obligated Humble to advance all sums needed to operate them. Each of the parties retained an interest in production, but Humble was entitled to recoup the nonoperating parties' shares of expenses from a portion of their shares of production.

On their returns, the taxpayers reported as income their shares of production used to reimburse Humble for the taxpayer's shares of operating expenses. They also claimed the following deductions: (1) Percentage depletion based upon the proportionate share of proceeds of oil used by Humble to pay their share of costs of drilling and development; (2) as expenses, similar proportionate shares of intangible drilling and development costs; (3) a similar proportionate share of depreciation of the amounts paid by Humble for tangible assets.

In determining that the taxpayers were not taxable on the gross proceeds of production used to reimburse Humble and were not entitled to the deductions as claimed, the Court of Appeals for the Fifth Circuit found that Humble could not look to the taxpayers for the repayment of the operating expenses but only to the oil, which might or might not produce sufficient income for reimbursement. Thus, Humble, and not the taxpayers, held the economic interest in the minerals in place. The court concluded by holding "that depreciation and intangible drilling and development costs are subservient satellites of depletion in situations involving carried interests,

and that, as the spoils go to the victor, so these deductions go to the rightful depleter." 399 F.2d at 446.

Petitioner, like Humble in *Cocke*, could only look to the income from the extraction of the materials for return of its investment. Thus petitioner, and not the participants, bore the risk that the mineral reserves might not produce income sufficient to repay petitioner, and it is this risk that is the prerequisite to the existence of an economic interest and the right to deduct these costs under section 1.612–4, Income Tax Regs. See *O'Conner v. Commissioner*, 78 T.C. 1, 11 (1982).

The only material difference between petitioner herein and Humble in *Cocke* is that Humble already owned a portion of the underlying property when it became the operator and petitioner herein did not. We must determine whether, upon entering the agreement and obligating itself to pay all operating expenses and at least $3 million in capital expenditures, petitioner "acquired by investment an interest in minerals in place," thereby satisfying the first prong of *Palmer v. Bender, supra*. We held in *Weaver v. Commissioner*, 72 T.C. 594, 602 (1979), that "the *investment* need not literally be an investment in the minerals in place; it suffices if the investment is a practical prerequisite to successful exploitation of rights to mine the mineral in place, so long as the taxpayer in fact acquires and owns a true capital interest in the mineral in place." Here, petitioner was obligated to begin expending all sums needed for capital outlays immediately upon entering the agreement. These expenditures provided petitioner with a partial interest in the oil and gas leases, in accordance with a binding agreement entered into prior to the expenditures and duly performed. Petitioner's commitment and performance under the agreement therefore provide the investment necessary under *Palmer v. Bender, supra*.

Because petitioner carried the burden of the total working interests and thus had the comprehensive economic interest in Unit Area A during 1975, 1976, and 1977, it is entitled to deduct the intangible drilling and development costs and to claim depreciation and investment tax credits attributable thereto.

To reflect the foregoing,

*Decision will be entered under Rule 155.*