**ITT CORPORATION, and AFFILIATED COMPANIES, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 1356, Docket 92–6007.

United States Court of Appeals, Second Circuit.

Argued April 16, 1992.

Decided May 14, 1992.

Stephen D. Gardner, New York City (James S. Eustice, Ann–Elizabeth Purintun, Robert A. Kagan, Richard F. Irwin, Kronish, Lieb, Weiner & Hellman, of counsel), for plaintiff-appellant.

Nancy G. Milburn, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Gabriel W. Gorenstein, Asst. U.S. Atty., of counsel), for defendant-appellee.

Before: LUMBARD and PRATT, Circuit Judges, and MUKASEY, District Judge.*

MUKASEY, District Judge:

ITT Corporation appeals from the order of the United States District Court for the Southern District of New York, Peter K. Leisure, *Judge,* disallowing claimed losses, arising from ITT's conversion and surrender of debentures issued by ITT's subsidiaries, for the tax years 1966 through 1969. Because we find that collateral estoppel bars the government from relitigating the deductibility of those losses, we reverse and remand.

## I.

During the tax years at issue—1966 through 1969—ITT was the parent of an affiliated group of corporations ("the ITT Group") as defined in § 1504(a) of the Internal Revenue Code of 1954, as amended. During that period, ITT's subsidiaries included ITT Aetna Finance Company ("ITT Aetna"), ITT Avis, Inc. ("ITT Avis"), ITT Continental Baking Company ("ITT Continental"), and International Standard Electric Company ("ISEC"). Each of ITT Aetna, ITT Avis, and ITT Continental was formed to acquire all the assets of a correspondingly named predecessor corporation: Aetna, Avis, and Continental. At the time of the respective acquisitions, each of the three predecessor companies had outstanding convertible debentures. Aetna and Continental each had one series of outstanding debentures; Avis had two such series. In connection with the acquisitions, the terms of the convertible debentures were amended. The acquiring ITT subsidiary assumed its predecessor's obligation on the debt feature of the debentures (*see* A106, A125, A140, A182), and ITT assumed each predecessor's obligation on the conversion feature by agreeing to exchange ITT stock for any outstanding debenture at the request of the debenture holder. (*See* A107–08, A126, A141, A183) The exchange ratios upon conversion were set in supple-

* The Honorable Michael B. Mukasey of the United States District Court for the Southern District of New York, sitting by designation.

mental indentures at the time of the respective acquisitions. (*See* A108, A127, A141, A182)

Although the provisions in the ITT Aetna, ITT Avis, and ITT Continental supplemental indentures treating the post-conversion survival of the debentures were not textually identical, their effect was the same: the issuing subsidiary's debt obligation on the debentures remained outstanding until ITT presented the converted debentures either to the issuing subsidiary or to the indenture trustee. (A109, A128, A143, A186)

ISEC, another member of the ITT Group, issued two series of debentures that also were exchangeable for ITT stock at the request of the debenture holder. (*See* A154, A164, A172, A176) As with the ITT Aetna, ITT Avis, and ITT Continental supplemental indentures, the ISEC indentures, and accompanying contemporaneous documents, preserved ISEC's debt obligation on the converted debentures until those instruments were presented to ISEC or to the indenture trustee. (A155, A171, A175, A177, A230)

From 1966 through 1969, numerous holders of the ITT Aetna, ITT Avis, ITT Continental, and ISEC debentures exchanged their debentures for ITT stock. During that same period, ITT presented the converted debentures to the issuing subsidiary in exchange for the face value of those debentures in cash or in credit to ITT's capital account in the relevant subsidiary.

Not surprisingly, the fair market value of the ITT stock exchanged for the debentures exceeded the face value of those debentures; otherwise, the debenture holders would not have exercised the conversion option. ITT's claimed losses, incurred when ITT presented the converted debentures to the subsidiary for cash or capital account credit, equal the difference between the fair market value of the ITT stock exchanged for the debentures and the face value of those debentures. ITT seeks a refund based on those losses.

ITT previously has litigated losses almost identical to the ones at issue here. In *International Tel. & Tel. Corp. v. Com-* *missioner,* 77 T.C. 60 and 77 T.C. 1367 (1981), *aff'd,* 704 F.2d 252 (2d Cir.1983) (per curiam) (hereinafter collectively *"ITT–1"),* the same parties litigated, with respect to the 1965 tax year, losses incurred by ITT when it presented converted ITT Aetna and ITT Avis debentures for redemption. (See A289) The Tax Court found that, under a regulation now no longer in effect, the repurchasing ITT subsidiary, and not ITT, could deduct losses incurred on the repurchase and retirement of those converted debentures. This Court affirmed that finding.

The district court in the current case found that the issue of ITT's basis in the converted debentures had been litigated fully in *ITT–1,* but that the issue of whether the debentures survived conversion had not. (A292–93) Moreover, on the merits, the district court found that ITT did not incur a recognizable loss when it converted and then redeemed the debentures. (A296) Accordingly, on ITT's motion for partial summary judgment and the government's cross-motion for partial summary judgment, the district court granted the government's motion and disallowed ITT's claimed losses. In addition to presenting arguments on the merits, ITT claims on appeal that *ITT–1* should bar the government from relitigating ITT's deduction of these losses.

## II.

As the district court pointed out, ITT's claims raise two issues that go to the underlying merits: (1) whether the debentures survived after conversion; and (2) ITT's basis in the debentures if they did survive. But those two issues should not be reached if *ITT–1* resolved them. For the reasons set forth below, we believe that *ITT–1* did resolve them, and that collateral estoppel bars the government from relitigating them.

"Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a

party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); *see also, Wilder v. Thomas*, 854 F.2d 605, 616 (2d Cir.1988), *cert. denied*, 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989).

Collateral estoppel has been applied narrowly in tax cases. In *Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), the Supreme Court held that, "where two cases involve income taxes in different taxable years, collateral estoppel must ... be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." 333 U.S. at 599–600, 68 S.Ct. at 720. The *Sunnen* rule was intended to prevent the application of collateral estoppel in a second action where "a subsequent modification of the significant facts or a change or development in the controlling legal principles ...," *id.* at 599, 68 S.Ct. at 720, has occurred. In those situations, the Court concluded that granting preclusive effect to a prior action would differentiate between taxpayers "of the same class" and consequently would create "inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion." *Id.*

■ As the district court noted, *Sunnen* has been modified, although not overruled, by *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). *See also Union Carbide Corp. v. Commissioner*, 671 F.2d 67, 68 (2d Cir.1982) (per curiam) (finding that the authority of *Sunnen* and its progeny had been weakened by *Montana* ). *Montana*, which held that the application of collateral estoppel in tax cases does not require direct identity of issue, set out a three-part test for determining whether collateral estoppel applies: "first, whether the issues presented by [the second] litigation are in substance the same as those resolved [in the first]; second, whether controlling facts or legal principles have changed significantly since the [first] judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." 440 U.S. at 155, 99 S.Ct. at 974. It is worth noting that a careful application of the second prong of *Montana*'s test should address the concern expressed in *Sunnen* that collateral estoppel in tax cases not result in discriminatory distinctions between taxpayers.

■ Applying *Montana*, the district court found, as set forth above, that the issue of "ITT's cost basis for the exchanged debentures of ITT Avis and ITT Aetna was fully litigated" in *ITT–1* (A292), but that *ITT–1* had not considered fully whether the debt obligation survived conversion. (A293) Unlike the district court, we find that *ITT–1* necessarily determined not only the issue of ITT's basis in the debentures, but also the issue of the post-conversion survival of the debentures.

Under *Montana*, we must determine first whether the issues presented in *ITT–1* are substantially the same as those presented by this action. In *ITT–1*, the same parties litigated, with respect to the 1965 tax year, losses ITT incurred when it presented converted ITT Aetna and ITT Avis debentures to those subsidiaries for redemption. The Tax Court found that ITT's claimed losses were controlled by former § 1.1502–41A(b), Income Tax Regs., which provided in pertinent part: "[I]f such bonds are acquired from another member of the group during a consolidated return period, ... the basis thereof to such other member of the group shall be deemed the purchase price."

The Tax Court read § 1.1502–41A(b) to mean that the ITT subsidiary in question repurchased its debentures from ITT for an amount equal to ITT's basis in those debentures; the Tax Court found that ITT's basis in the debentures was equal to the fair market value of the ITT stock issued in exchange for those debentures when the holders exercised the conversion option. 77 T.C. at 79–80. Therefore, the ITT/ITT subsidiary transaction resulted in neither a gain nor a loss to ITT; in tax argot, it was a wash. *Id.* at 80.

The Tax Court then faced the question whether ITT Aetna and ITT Avis experienced any tax consequences when they repurchased and retired the converted debentures. Because it concluded that ITT had submitted insufficient evidence of ITT Aetna's and ITT Avis' issuance cost of the debentures, the Tax Court found that those subsidiaries could not take loss deductions. *Id.* at 81, 84. After ITT submitted further evidence on the issuance cost of the debentures, the Tax Court found that ITT Avis and ITT Aetna had suffered losses equal to the difference between the issuance cost of the debentures and the repurchase price; that price was equal to ITT's basis in the debentures, which the Tax Court had found to be equal to the fair market value of the ITT stock exchanged for the debentures. That difference was allowed as a deduction. 77 T.C. at 1368. This Court affirmed the Tax Court's findings in a brief *per curiam* opinion. *See* 704 F.2d at 253.

The issues before the Tax Court necessarily included the specific issue now before us: the deductibility of ITT's losses incurred when ITT presented converted debentures to the issuing subsidiary in exchange for the face value of those debentures, "paid" either in cash or capital account credit. The substantial similarity between the issues presented in *ITT-1* and those presented here is not diminished by the inclusion in this case of the ITT Continental and ISEC debentures, and their corresponding indentures. The ITT Aetna and both ITT Avis indentures, all considered by the Tax Court in *ITT-1*, do not contain identical language. Nonetheless, the Tax Court reached the same conclusion with respect to all three sets of debentures—the ITT Aetna and the two series of ITT Avis debentures—because the *effect* of the language in each of the indentures was the same: each caused the subsidiary's debt obligation to survive until the converted debentures were presented to the issuing subsidiary or to the indenture trustee. Similarly, the language of the ITT Continental indenture and the ISEC indentures vary slightly, from one another and from the ITT Aetna and ITT Avis indentures. However, as with the variations among the ITT Aetna and ITT Avis indentures, these variations do not alter the subsidiary's continued indebtedness on the converted debentures.

Second, under *Montana,* we must determine whether it would be inappropriate to apply collateral estoppel here because controlling facts or legal principles have changed since *ITT-1*. Although the Tax Court's determination of ITT Aetna's and ITT Avis' losses resulted from that court's application of former § 1.1502–41A(b), the Tax Court's findings as to the debentures' post-conversion survival, and ITT's basis in the debentures, did not *result* from the application of § 1.1502–41A(b). Rather, those findings were necessary before that now-defunct regulation could be applied. Before the Tax Court could find that the application of § 1.1502–41A(b) resulted in deductible losses to ITT Aetna and ITT Avis equal to the difference between the subsidiary's issuance cost of the debentures and the subsidiary's repurchase cost, that court had to make independent findings (i) that ITT sold the converted debentures to the issuing subsidiary, and (ii) that ITT's basis in the converted debentures was equal to the fair market value of the ITT stock issued in exchange for the debentures.

Two features of the lapsed regulation support that conclusion. First, § 1.1502–41A(b) specifically stated that it applied when a member corporation "acquires its bonds." For the Tax Court to have found that the relevant ITT subsidiary acquired the converted debentures from ITT, the Tax Court also must have found that the debentures were not extinguished when ITT exchanged them for ITT stock. One cannot purchase something that no longer exists.

Second, § 1.1502–41A(b) provided a mechanism for deferring gains or losses on inter-group bond transactions. Under that regulation, the I.R.S. simply treated the selling corporation's basis in the bonds as the acquiring corporation's purchase price, thereby creating what was effectively an artificial purchase price. However, that regulation did not direct how the selling or

the acquiring corporation's basis in the bonds was to be determined; those bases were to be determined independently according to other relevant Code/Reg. provisions and/or case-law. As the Tax Court wrote in *ITT–1,*

> Having decided that the conversions were separate and distinct from the plan of reorganization and keeping in mind that *ITT was only obligated in respect to the conversion feature, and not the debt obligation of the debentures,* it seems to us clear that *the bases to ITT for the Aetna and Avis debentures were the fair market values of the ITT shares given in exchange therefor....*

77 T.C. at 80 n. 23 (emphasis added). As the above quotation shows, *ITT–1* determined that ITT had a basis in the converted debentures (*i.e.,* that the converted debentures survived in ITT's hands), and that that basis was equal to the fair market value of the ITT stock exchanged for those debentures. Neither of these determinations depends for its current validity on the continued existence or application of § 1.1502–41A(b), although both were necessary before that regulation could be applied. Moreover, research has disclosed no other change in the relevant legal principles regarding ITT's basis in the debentures or the post-conversion survival of the debentures since the Tax Court rendered its decision. Consequently, even though § 1.1502–41A(b) has lapsed, collaterally estopping the government from relitigating the Tax Court's determinations of the debentures' post-conversion survival and ITT's basis in the debentures will not place ITT in a different position from other similarly situated taxpayers—the result forbidden by *Sunnen, supra.*

Finally, under *Montana,* we must determine if there are any special circumstances warranting an exception to the normal rules of preclusion. We find that there are none. First, this case does not present a substantially unrelated claim to which we are being asked to apply a prior determination of "unmixed questions of law." *See United States v. Moser,* 266 U.S. 236, 242, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924). Although the distinction drawn in *Moser* between unmixed questions of law and "a fact, question, or right distinctly adjudged in [an] original action," *id.* (emphasis omitted), is unclear, *see Montana,* 440 U.S. at 163, 99 S.Ct. at 978, the case at hand falls far outside the *Moser* exception. This case does not present a "different demand," *Moser,* 266 U.S. at 242, 45 S.Ct. at 67, or a "substantially unrelated claim," *Montana,* 440 U.S. at 162, 99 S.Ct. at 978; rather, the same parties are litigating facts that are in all relevant respects the same as those addressed in *ITT–1.*

Second, the government has not alleged any procedural deficiency in *ITT–1.* *See Montana,* 440 U.S. at 163–64, 99 S.Ct. at 979. Therefore, this case presents no exceptional circumstances justifying a deviation from the normal rules of preclusion.

For the above reasons, we find that collateral estoppel applies to the case at hand and bars the government from relitigating the deductibility of ITT's claimed losses. The parties fully and fairly litigated in *ITT–1* both the debentures' post-conversion survival and ITT's basis in those converted debentures. Accordingly, the judgment of the district court is reversed and the case is remanded for entry of judgment consistent with this opinion.