105 T.C. No. 20

UNITED STATES TAX COURT

REYNOLDS METALS COMPANY AND CONSOLIDATED SUBSIDIARIES,
Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24939-93.                    Filed October 16, 1995.


     In 1968, S, P's wholly owned subsidiary, issued
debentures, convertible into shares of common stock of
P.  In 1987, S called the debentures for redemption,
thereby prompting most debenture holders to convert
their debentures into P's common stock.  The converted
debentures were subsequently redeemed by S for cash in
an amount equal to the principal of the debentures with
accrued interest.  P and its consolidated subsidiaries
claimed a capital loss deduction under sec. 165(f),
I.R.C., in the amount by which the fair market value of
P's stock issued in the exchange exceeded the principal
of the exchanged debentures.  Held, P is not entitled
to a capital loss deduction.  International Telephone &
Telegraph v. Commissioner, 77 T.C. 60 (1981),
supplemented by 77 T.C. 1367, affd. per curiam 704 F.2d
252 (2d Cir. 1983), distinguished.

Robert A. Warwick and Frederick H. Robinson, for petitioners.

Lindsey D. Stellwagen and Kristine A. Roth, for respondent.

OPINION

TANNENWALD, Judge: Respondent determined deficiencies in petitioners' 1987 and 1988 Federal income taxes in the amounts of $430,030 and $357,028, respectively. The sole issue remaining in dispute is whether petitioners are entitled to a capital loss deduction for 1987, under section 165(f),[1] with respect to certain convertible debentures issued by a wholly owned subsidiary and convertible into the stock of the common parent corporation.

All the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners are the Reynolds Metals Company and Consolidated Subsidiaries (the Reynolds Group). The common parent is Reynolds Metals Company (hereinafter referred to as Metals). Metals is a Delaware corporation with its principal place of business in Richmond, Virginia. Metals and its consolidated subsidiaries

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

filed their corporate income tax return for the taxable year ended December 31, 1987, with the Internal Revenue Service at Memphis, Tennessee.

At all relevant times, Metals served global markets as a supplier and recycler of aluminum and other products. It is a vertically integrated producer of a wide variety of value-added aluminum products. In 1987, Metals and its affiliates were among the largest producers of aluminum and aluminum products in the world.

On May 16, 1968, the Board of Directors of Metals unanimously approved the draft forms of an Offering Prospectus, Indenture, and Underwriting Agreement proposed to be used in the foreign offering of $50 million of subordinated guaranteed convertible debentures due 1988, predicated upon the fact that Metals' financial advisers recommended that the offering be marketed as promptly as practicable. The Board further approved a plan to organize a wholly owned Delaware subsidiary to issue the debentures. The plan was outlined in a document, presented to each member of the Board, entitled "Memorandum To The Holders Of First Mortgage Bonds Of Reynolds Metals Company". The plan contemplated that Metals would contribute its 31-percent interest in the Canadian British Aluminum Company Limited (CBA), a Quebec corporation, to the newly formed subsidiary, and that the subsidiary would purchase 47-percent and 5-percent interests in CBA from The British Aluminum Company Limited (BA), and Tubes

Canadian Holdings Limited (TCH), respectively, using the proceeds of the offering. The remaining 17-percent interest in CBA was to remain publicly held. Metals owned directly and indirectly a 48-percent interest in BA.

It was intended that the funds were to be raised abroad in a manner not adversely affecting the U.S. balance of payments in compliance with a program initiated by the U.S. government on January 1, 1968, and set forth in Direct Foreign Investment Regulations. See 33 Fed. Reg. 49 (Jan. 3, 1968). The plan also contemplated that the newly formed subsidiary would satisfy the 80-percent income from non-U.S. sources requirement of those regulations in order to exempt the interest on the debentures from the U.S. withholding tax on nonresident aliens or foreign corporations and provide estate tax benefits to such aliens. See Committee on Taxation of International Finance and Investment of New York State Bar Association, Tax Section, "Report on International Finance Subsidiaries," 28 Tax L. Rev. 443, 444 (1973).

The memorandum presented to the Board contemplated that Metals would benefit from the outlined plan in the following manner:

1.  BA will increase its capacity for the production of primary aluminum and alumina in the United Kingdom.

2.  Reynolds Metals will increase its equity ownership in CBA from 31% to 83%.

3.   By making the Debentures convertible into its Common Stock, Reynolds Metals is potentially enlarging its equity base and is providing for a wider international distribution of its Common Stock.

On May 27, 1968, Reynolds Metals European Capital Corporation (RMECC) was organized as a wholly-owned subsidiary of Metals.  RMECC's authorized capital stock was 100,000 shares, having a par value of $1.  Metals acquired 1,000 shares of the RMECC stock for $1,000, which constituted all of the issued and outstanding stock.  The organization of RMECC was ratified and approved by the Board of Directors of Metals at a special meeting held June 4, 1968.  The board further directed that authorized, but unissued, common stock of Metals be reserved for the conversion feature of the debentures to be issued by RMECC.

Since its organization, RMECC has joined in the filing of the Reynolds Group's consolidated Federal income tax return.  As of July 17, 1968, RMECC did not own or lease any physical facilities or properties other than books and records.  Also, each of RMECC's directors and officers was an officer or director of Metals and received no remuneration from RMECC.

At the time of RMECC's incorporation, CBA owned and operated an aluminum reduction plant located at Baie Comeau, Quebec, having the capacity to produce approximately 115,000 tons of primary aluminum annually.  An aluminum reduction plant converts raw materials, principally alumina, into primary aluminum using an electrolytic process.  As of December 31, 1968, CBA had

authorized and issued 1,088,999 class A shares and 3,500,000 class B shares.

In connection with the organization of RMECC, Metals made a contribution to RMECC's capital of its 31-percent interest in CBA, represented by 271,329 class A shares and 1,162,000 class B Shares of CBA. At the time of transfer, the shares, which Metals had acquired in 1966, had a total value on the books of Metals of $32,975,000. Metals also intended that RMECC would acquire, and then hold, the stock of CBA held by BA and TCH.

Metals and RMECC together negotiated the CBA stock acquisition from BA. Initially, it had been contemplated that RMECC would either acquire the shares directly, or that Metals would acquire the shares and make a capital contribution of the shares to RMECC.

On August 15, 1968, RMECC purchased from BA its 47-percent interest in CBA, including 56,400 class A shares and 2,100,000 class B shares, for the Canadian dollar equivalent of US$39,194,618 (C$42,049,800 x 0.9321). In consideration of the sale of its CBA stock to RMECC, Metals agreed to several considerations in favor of BA, including to procure the full and prompt performance of RMECC, to aid BA in procuring CBA to enter into termination contracts with BA, and to acquire the rights and assume all the obligations of BA with respect to its long-term contracts with CBA for exchanging alumina for aluminum and for the purchase of aluminum.

RMECC purchased a 5-percent interest in CBA, represented by 6,392 class A shares and 238,000 class B shares, on December 27, 1968, from TCH.

As of December 31, 1968, RMECC owned 334,121 class A shares and 3,500,000 class B shares of CBA. These shares represented a 95.9-percent voting interest and an 83-percent interest by value.

As of December 31, 1968, RMECC had a capital surplus of $34,290,413.47 and retained earnings of $692,457.82.

In 1968, RMECC issued $50 million of 5-percent Subordinated Guaranteed Convertible Debentures Due 1988 (the debentures) in the European market. The debentures were bearer bonds in denominations of $1,000, with interest coupons attached. The debentures bore interest from June 1, 1968, which was payable semi-annually on June 1 and December 1 each year. They were dated June 1, 1968, and matured on June 1, 1988.

RMECC sold the debentures to underwriters Dillon, Read & Co., S. G. Warburg & Co., Ltd., and Reynolds & Co., who agreed not to sell, directly or indirectly, any of the debentures to any citizen, resident, partnership, corporation, or any other entity located in the United States or its territories or possessions.

The legend on the face of the debentures states:

> The issuer of this Debenture has been formed or availed of for the principal purpose of obtaining funds (directly or indirectly) for foreign issuers or foreign obligors. Consequently, the United States Internal Revenue Service has ruled that United States persons (as that term is defined in Section 4920(a)(4) of the United States Internal Revenue Code of 1954) will be

required to report and pay United States Interest Equalization Tax with respect to acquisition of this Debenture except where a specific statutory exemption is applicable. [Emphasis added.]

The debentures were issued under an indenture (the indenture) dated as of June 1, 1968, among RMECC as obligor, Metals as guarantor and Chemical Bank New York Trust Company as indenture trustee. The indenture governs the rights and obligations of RMECC, Metals, and Chemical Bank as between themselves and with respect to the holders of debentures. The indenture was never modified or revoked.

The indenture contains, in part, the following provisions:

Definitions.

Section 1.01. * * *

* * * * * * *

The term "outstanding", when used with reference to Debentures, shall, subject to the provisions of Section 9.04, mean, as of any particular time, all Debentures, except

(a) Debentures theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(b) Debentures for the payment or redemption of which moneys in the necessary amount shall have been deposited in trust with the Trustee, provided that if such Debentures are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given as in Article Five provided, or provision satisfactory to the Trustee shall have been made for giving such notice; and

(c) Debentures in lieu of or in substitution for which other Debentures shall have been authenticated and delivered pursuant to the terms of Section 2.07.

\* \* \* \* \* \* \*

Section 2.08. \* \* \* If the Company [RMECC] or the Guarantor [Metals] shall acquire any of the Debentures (including, without limitation, Debentures delivered to the Company or the Guarantor to effect a conversion pursuant to Article Four), such acquisition shall not operate as a redemption or satisfaction of the indebtedness represented by such Debentures unless and until the same are delivered to the Trustee for cancellation.

\* \* \* \* \* \* \*

Section 4.12. All Debentures upon conversion pursuant to this Article Four (hereinafter in this Section 4.12 called "Converted Debentures") shall be imprinted or stamped with a legend indicating such conversion and whether it was effected by the Guarantor or by the Company and such Converted Debentures shall, except as they may be used to reduce, or for credit against, sinking fund payments, as permitted by Section 5.03, be held by the Guarantor or the Company and may, at any time, be delivered to the Trustee for cancellation and thereupon shall be cancelled by it. Converted Debentures shall not be transferred except from the Guarantor to the Company or from the Company to the Guarantor. Converted Debentures shall not be further convertible into Common Stock of the Guarantor, and shall not be redeemable, whether by operation of the sinking fund provided for in Section 5.02 or otherwise, unless all Debentures at the time outstanding shall be redeemed at the same time.

\* \* \* \* \* \* \*

Section 5.01. The Company may, at its option, redeem Debentures at the times, in the amounts and at the redemption prices then applicable thereto as specified in the form of Debenture hereinabove set forth. \* \* \*

Section 5.02. The Debentures shall also be subject to redemption on June 1, 1979 and on each June 1 thereafter to and including June 1, 1987 (each such date being herein referred to as a "sinking fund redemption date"), through the operation of the sinking fund, at a redemption price equal to 100% of the principal amount of the Debentures to be redeemed,

together with accrued interest to the date fixed for redemption.

As a mandatory sinking fund for the retirement of the Debentures, the Company will, * * * pay to the Trustee, on or before the business day next preceding each sinking fund redemption date * * * an amount in cash equal to five percent * * * of the aggregate principal amount of Debentures outstanding at the close of business on March 1, 1979 (excluding any Debentures which shall have been converted on or prior to such date pursuant to Article Four).  * * * [Emphasis added.]

Section 5.05 of the indenture provides that, in the event of a notice of redemption pursuant to sections 5.01 and 5.02, interest would accrue to a date specified in the notice and cease to accrue thereafter.  Section 5.05 further excludes converted debentures from the determination of the amount of funds needed after a redemption call.  Section 5.07 provides for the repayment to REMCC of the amount in the sinking fund not required for the redemption of converted debentures.

Under Article Four of the indenture, a holder of debentures had the right, at any time beginning March 31, 1969, and prior to maturity or other redemption of the debentures, to exchange debentures for common shares of Metals at a fixed price, initially $46 per share (i.e., 21.74 shares per $1,000 principal value of debentures), subject to adjustment under certain circumstances.  Section 4.01 provides that Metals would effectuate any such exchange absent an agreement between Metals and RMECC that RMECC should do so.

If an agreement was reached by which RMECC would effect the conversion, Metals was obligated to sell to RMECC upon demand shares of common stock sufficient to convert all outstanding debentures (less any shares held by RMECC). Unless otherwise agreed, RMECC would pay Metals the conversion price for shares purchased.

Between June 1, 1971, and June 1, 1981, inclusive, the debentures were redeemable with a premium. After June 1, 1981, RMECC had the right to call the debentures for redemption without premium. Debentures could be redeemed in two ways: (1) RMECC at its option could call some or all of the debentures for redemption; or (2) debentures were subject to redemption through the operation of the sinking fund. If all of the debentures were called for redemption (or specifically numbered debentures were called), the holder could effect conversion up to the close of business on the date of redemption. Upon conversion, the rights of the holder of such debenture ceased. RMECC could call for a redemption if the U.S. tax laws changed and caused RMECC to pay "additional interest". Under the indenture, RMECC agreed to pay as "additional interest" any taxes, assessments, and governmental charges that may be imposed on foreign debenture holders, with specified conditions and exceptions.

As guarantor of the debentures, Metals unconditionally guaranteed to the debenture holders the punctual payment of the

debenture principal, premiums, interest, and the sinking fund, as well as the conversion of the debentures.

Debentures which had been either redeemed or converted could be delivered by Metals or RMECC to the trustee with an Officers' Certificate to receive additional credit against the sinking fund payments.

In the event that RMECC made a call of redemption under section 5.01 of the indenture, RMECC was required to deposit with the trustee enough money to redeem all the debentures called for redemption (except for debentures converted prior to the payment date) plus the accrued interest. The indenture did not require RMECC to deposit money with the trustee for the redemption of converted debentures. After a call for redemption, the indenture provided that the trustee would repay to RMECC the money that was deposited with the trustee for redemption of debentures but was not used because debentures were converted.

In 1970, CBA was amalgamated with CRM Capital Limited (Capital), a Quebec corporation, to form Canadian Reynolds Metals Company Limited (CRM), a Quebec corporation. In the amalgamation, RMECC received all of the issued and outstanding common stock of CRM. Under CRM, the production capacity of the Baie Comeau plant increased from 175,000 tons per year in 1970 to over 300,000 tons per year in 1985.[2] In 1983, CRM expanded its

---

[2] As noted above, at p. 5, production capacity in 1968 was

(continued...)

operations to include the manufacture of finished and semifinished aluminum products by amalgamating with other Canadian affiliates of Metals.  In 1987, CRM produced 304,955 tons of primary aluminum.  In 1987, CRM's gross sales to unaffiliated customers totaled about $110 million, and CRM's gross sales to affiliates totaled about $400 million.

In February 1987, RMECC issued additional stock for $31 million to Reynolds Energy Resources Corporation (RERC) in contemplation of the redemption of the debentures.  At that time, RERC was 100-percent owned by RMC Holdings, Inc., which was 100-percent owned by Metals.

From their issuance through February 24, 1987, the aggregate principal amount of outstanding debentures was reduced to $29,773,000.

On February 24, 1987, RMECC called the debentures for redemption (the call), effective at the close of business March 26, 1987 (the redemption date).  On February 23, 1987, Metals filed with the Securities and Exchange Commission a registration statement registering 681,503 shares, the maximum number of shares required if all of the debentures that were outstanding on February 24, 1987, had been exchanged for shares pursuant to the indenture.

---

[2](...continued)
115,000 tons per year.  There is nothing in the record explaining the capacity increases, although Metals infers that it is responsible in some manner.

A holder who surrendered debentures for redemption in cash pursuant to the call would have been entitled to receive $1,015.97, consisting of $1,000.00 principal and $15.97 accrued interest for each $1,000.00 face value of debentures surrendered.

If a debenture holder instead exercised the right of conversion, the holder would have been entitled to receive 22.89 shares for each $1,000 face value of debentures delivered to Metals, pursuant to the terms of the indenture.  During the period of redemption, the market price of shares at the close of business on the day prior to the dates on which conversions occurred ranged from a low of $52.75 on March 4, 1987, to a high of $65.00 on March 26, 1987.  Thus, the value of the shares into which a debenture having a face value of $1,000.00 could be converted ranged from $1,207.45 to $1,487.85, respectively.

On February 24, 1987, Metals entered into a standby agreement with Goldman, Sachs & Co. and Salomon Brothers Inc. (the standby purchasers).  Under the agreement, the standby purchasers offered to purchase debentures from holders at a price of $1,017 per $1,000 face amount until the close of business on the redemption date.  The price offered exceeded the redemption price of $1,015.97, reflecting Metals' desire to minimize the amount of debentures surrendered for redemption.

The standby purchasers were obligated to convert all debentures they purchased.  They could also purchase debentures

in the open market and agreed to convert all debentures so purchased.

By letter dated March 4, 1987, Metals instructed Chemical Bank in New York, Chemical Bank in London, S. G. Warburg & Co., Ltd., in London, and Banque Internationale a Luxembourg S.A. in Luxembourg (the agents), that any debentures surrendered to them for conversion "should be forwarded in the normal course to Chemical Bank in New York as principal conversion agent (not as Trustee, as indicated in the letter to you dated February 24, 1987 from the Guarantor)."  By a second letter dated March 4, 1987, Metals advised Chemical Bank in New York that it had instructed all of the conversion agents "to forward all Debentures surrendered to them for conversion to Chemical Bank in New York as principal conversion agent."  Metals further instructed Chemical Bank in New York that such converted debentures were to be held for the account of Metals, as provided by section 4.12 of the indenture dated as of June 1, 1968.  The letter to Chemical Bank also provided:

> In your role as principal conversion agent, converted Debentures held for the account of the Guarantor should be surrendered for redemption to Chemical Bank as paying agent as provided by Section 4.12 of the Indenture.  Chemical Bank as paying agent is further instructed to pay the redemption price ($1,000 principal amount plus $15.97 accrued interest per $1,000 Debenture) to the Guarantor on the Redemption Date, or, in the event that knowledge of conversions is not known in time to make payment on the Redemption Date, as soon as possible thereafter. * * *

When payment of the redemption price has been made to the Guarantor, the paying agent should surrender converted Debentures for cancellation to the Trustee.

From March 4, 1987, to March 26, 1987, debentures having an aggregate face value of $29,150,000 were delivered to the agents and were exchanged upon delivery for 667,314 shares pursuant to the indenture.  Of this total, debentures with a face value of $23,000 were delivered by the standby purchasers.  The value of the shares delivered in exchange for debentures was $41,879,710. In connection with these exchanges, Metals paid $6,242 in lieu of fractional shares and incurred expenses in the amount of $288,769.

After February 24, 1987, and before April 21, 1987, debentures with a face value of $25,000 were delivered to the agents and were redeemed for cash.  As of April 21, 1987, debentures having an aggregate face value of $598,000 were unaccounted for.  These debentures ceased to accrue interest as of March 26, 1987, and, if and when surrendered for redemption, have been or will be redeemed in cash for their face value plus interest accrued to March 26, 1987.  Chemical Bank, as indenture trustee, opened Chemical Bank account number 506-032647 as the bond account to redeem the debentures.  As of October 25, 1994, the account was still open as not all debentures have been presented for redemption.

On March 25, 1987, RMECC delivered $30,248,474.81 to account number 506-032647 by wire transfer.  This amount represented the

full amount required to pay all principal and interest due on the debentures outstanding on the date of the call.

Between March 26, 1987, and April 1, 1987, Chemical Bank, the indenture trustee, transferred to Metals' account by wire transfer a total of $29,680,547.52. The amount of the transfers represents an amount equal to the amount of principal and interest payable by RMECC on the redemption date ($1,015.97 for each $1,000.00 of face value) that would apply to $29,214,000 total face value of debentures. Because Metals had only received $29,150,000 of debentures in exchange for shares, Metals received cash payments for $64,000 face value of debentures to which it was not entitled. Thus, on April 13, 1987, Metals transferred to the indenture trustee by debit memorandum from Metals' bank account at Chemical Bank $65,022.08.

On October 27, 1987, the Indenture Trustee destroyed the certificates representing the 29,150 debentures acquired by Metals in exchange for shares.

In a notice of deficiency, respondent disallowed petitioners' claimed capital loss deduction in the amount of $13,024,721, representing the difference between the cost of exchanging Metals' stock (the fair market value of the stock plus expenses incurred plus cash paid in lieu of fractional shares) for the debentures ($42,174,721), and the face value of the exchanged debentures ($29,150,000).

Petitioners recognize that the issuance of Metals' shares in satisfaction of its conversion obligation under the debentures does not give rise to a loss. Sec. 1032(a);[3] National Can Corp. v. United States, 687 F.2d 1107, 1116 (7th Cir. 1982). Petitioners argue, however, that: (1) When Metals exchanged the debentures acquired as a result of the conversions, they became capital assets in its hands and acquired a basis equal to the fair market value of its shares issued to the debenture holders; and (2) when RMECC redeemed the debentures, Metals had a capital loss under section 165(f) equal to the excess of such value over the redemption price paid to it by RMECC. Respondent counters that: (1) The debentures did not survive the conversions with the result that Metals suffered no loss on their redemption; and (2) if the debentures did survive the conversions, the excess of the fair market value of Metals' shares over the amount it received on redemption, i.e., the principal, of the debentures constituted a capital contribution to RMECC rather than a capital loss under section 165(f). The burden is on petitioners to show that they are entitled to the deduction. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

---

[3] Sec. 1032(a) provides in pertinent part: "No gain or loss shall be recognized * * * on the receipt of money or other property in exchange for stock (including Treasury stock) of such corporation."

<u>Did the debentures survive the conversions</u>?

Petitioners and respondent agree that the rights and obligations of Metals, RMECC, and the debenture holders are governed by the terms of the indenture.

Under the terms of the indenture, cancellation of debentures occurs in a circumscribed manner. Section 1.01 (<u>supra</u> p. 8) provides that debentures are outstanding until they have been canceled or delivered for that purpose to the indenture trustee. Under the terms of the indenture, Metals was obligated to exchange its stock for the debentures, upon their submission by the debenture holders. Section 2.08 (<u>supra</u> p. 9) states that such acquisition by Metals "shall not operate as a redemption or satisfaction of the indebtedness represented by such Debentures unless and until the same are delivered to the Trustee for cancellation."

There are further indications that the parties clearly contemplated that converted debentures would exist after conversion. Thus, section 4.12 (<u>supra</u> p. 9) provides: "Converted Debentures shall not be further convertible into Common Stock of * * * [Metals], and shall not be redeemable, * * * unless all Debentures at the time outstanding shall be redeemed at the same time."

The several provisions of Article Five, cited by respondent, admittedly treat converted debentures differently from other

debentures.  For example, under section 5.02 (supra pp. 9-10), minimum payments to a sinking fund are to be computed by reference to outstanding debentures less converted debentures. Sections 5.05 and 5.07 (supra p. 10) contain provisions for adjustment of the sinking fund and calculation of payment for redemption to take converted debentures into account.  These provisions do no more than modify the need for a sinking fund with respect to converted debentures that would be in the hands of RMECC, the entity obligated on the debenture, or Metals, its parent, neither of whom would need to have funds set aside to pay themselves.  Elimination of converted debentures from the sinking fund does no more than reflect the realities of the relationship between RMECC and Metals and fails to counteract the other indications that the converted debentures were to survive the exchange.  Nor are we persuaded that Metals was attempting to change the terms of the debentures by the correspondence with Chemical Bank in New York relating to its status as conversion agent instead of as trustee, see supra p. 15.  In our judgment, this correspondence reflects a careful effort to comply with, not modify, the terms of the indenture.

The terms of the indenture herein are substantially similar to those of the indenture involved in Husky Oil Co. v. Commissioner, 83 T.C. 717 (1984), affd. sub nom. Marathon Oil Co. v. Commissioner, 838 F.2d 1114 (10th Cir. 1987), where we

concluded that liability for the principal of debentures issued by the subsidiary remained outstanding after their acquisition by the parent in exchange for the latter's stock. Respondent seeks to distinguish Husky Oil Co. because of language in the indenture relating to the subordination of the converted debentures, see id. at 735, which is not present in the debenture involved herein. We are satisfied, however, that the presence of this language was not the exclusive basis for our conclusion that the debentures survived in the hands of the parent. Moreover, we are satisfied that any gap in the indenture involved herein by reason of the omitted language is filled by at least one other provision, i.e., the parenthetical clause in section 2.08 of the within debenture, see supra p. 9, which is omitted from the comparable provision in the debenture in Husky Oil Co. v. Commissioner, 83 T.C. at 721.

Further support for our conclusion can be found in International Telephone & Telegraph v. Commissioner, 77 T.C. 60 (1981), supplemented by 77 T.C. 1367, affd. per curiam 704 F.2d 252 (2d Cir. 1983), as interpreted by the Court of Appeals for the Second Circuit in ITT Corp. v. United States, 963 F.2d 561 (2d Cir. 1992), revg. 90-1 USTC par. 50,214 (S.D.N.Y. 1990), which is further discussed later in this opinion (infra pp. 22-23 and 25-26). In that case, the parent exchanged its stock for debentures of its subsidiaries in accordance with the terms of

the debentures.  We dealt with the question of entitlement of the parent or subsidiary to a loss in light of a provision in a consolidated return regulation that is no longer in effect.[4]  Our holding that the subsidiaries had deductible losses was within that narrow framework.  Although not expressly articulated, that the debentures survived their acquisition by ITT was an essential element of our ultimate conclusion.  See Id., 963 F.2d at 565-566.

The cases relied upon by respondent, Chock Full O'Nuts Corp. v. United States, 453 F.2d 300, 304-305 (2d Cir. 1971); AMF Incorporated v. United States, 201 Ct. Cl. 338, 476 F.2d 1351, 1353-1354 (1973); Hunt Foods & Industries, Inc. v. Commissioner, 57 T.C. 633, 642 (1972), affd. per curiam 496 F.2d 532 (9th Cir. 1974), for the proposition that convertible debentures can be only converted or redeemed, but not both, are clearly distinguishable.  First, each case addressed the distinct issue whether the taxpayer could deduct as original issue discount the part of the issue price attributable to the conversion feature.

---

[4]  The regulation, sec. 1.1502-41A, Income Tax Regs., is not applicable for tax years beginning after Dec. 31, 1965.  See T.D. 6894, 1966-2 C.B. 362.  Under former sec. 1.1502-41A, Income Tax Regs., the subsidiaries in International Telephone & Telegraph v. Commissioner, 77 T.C. 60 (1981), supplemented by 77 T.C. 1367, affd. per curiam 704 F.2d 252 (2d Cir. 1983), were considered to have purchased their debentures from the parent, ITT, for an amount equal to ITT's basis in the debentures and the subsidiaries bore losses.  International Telephone & Telegraph v. Commissioner, 77 T.C. at 1368.

Second, in each case, the taxpayer was both the issuer of the debentures and the party responsible for their conversion into its stock, so that it was not possible for the debentures to be converted without being returned to the issuer and obligor. Such is not the case herein.

Respondent seeks to find support for her position from the District Court opinion in ITT Corp. v. United States, supra. In that case, the District Court first held that this Court's decision in International Telephone & Telegraph v. Commissioner, supra, had collateral estoppel effect with respect to the issue of ITT's basis in debentures acquired in an exchange for stock, but not as to whether the debentures survived the exchange. The court then proceeded to find that the debentures did not survive the exchange. This decision was reversed, on the basis that collateral estoppel applied to both issues. The Court of Appeals reasoned that, although we had applied a particular consolidated return regulation in International Telephone & Telegraph v. Commissioner, supra, we had necessarily decided that the debentures had survived the exchange, following which, ITT had sold the converted debentures to the issuing subsidiaries. ITT Corp. v. United States, 963 F.2d at 565-566.

Finally, respondent argues that the converted debentures were not redeemable because section 4.12 of the indenture requires that all debentures be presented for redemption at the

same time, which did not happen as evidenced by the few debentures still unaccounted for.  We disagree.  All that was required in order for the converted debentures to be redeemable was that all the outstanding debentures be called for redemption at the same time, a requirement that was satisfied.  In this connection, we note the debentures ceased to accrue interest as of the redemption date.  The fact that some holders, for reasons of their own and over whom neither Metals nor RMECC had any control, did not seek to be paid or to exchange their debentures is and should be irrelevant.  A contrary conclusion would produce a totally unworkable situation.

In sum, we hold that the converted debentures survived as obligations of RMECC.  This being the case, we must now determine the extent of the loss, if any, to Metals upon their subsequent redemption by RMECC.

Did Metals have a capital loss upon the redemption of the debentures?

Resolution of this question involves a determination of Metals' basis in the debentures and whether there was an excess of that basis over the principal amount of the debentures received by Metals upon the redemption of RMECC which constitutes a deductible capital loss.  We turn first to the question of basis.

Generally, a corporation issuing its own stock in exchange for property has a basis in the property equal to the fair market value of the stock issued in exchange for the property. Sec. 1012; Simmonds Precision Prods. v. Commissioner, 75 T.C. 103, 115 (1980). Expenses incurred in the transaction are also properly included in basis. Sec. 1016(a).[5]

We applied this general rule in the similar situation presented in International Telephone & Telegraph v. Commissioner, supra, wherein we held the debentures had a basis to ITT equal to the value of the ITT stock for which they were exchanged, for purposes of applying a then-existing consolidated return regulation. ITT Corp. v. United States, 963 F.2d at 565-566; Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 3.12[2], at 3-61 n.270 (6th ed. 1994). Our application of the regulation produced the conclusion that the subsidiaries, not ITT, were entitled to the losses. See International Telephone & Telegraph v. Commissioner, 77 T.C. at 80. The issue of ITT's basis was presented to the court in terms of the Government's contention that the exchange of ITT's stock extinguished the obligation of the subsidiaries to redeem the debentures so that the entire fair market value of the ITT stock constituted a contribution by ITT to the capital of the

---

[5] The parties do not dispute that $6,242 payments for fractional shares and $288,769 expenses, see supra p. 16, should be included in basis.

subsidiaries.  Neither party suggested that such fair market value should be allocated between the elements involved in the exchange.  Under these circumstances, we did not address the question whether, had ITT been entitled to deduct such losses, the full amount of the fair market value of the ITT stock should have been taken into account or whether a portion of that value should have been treated as a capital contribution to the subsidiaries.  Furthermore, we noted that we were expressing no opinion as to what our position would be outside the consolidated return arena, i.e., in a situation where the consolidated return regulations did not apply.  See International Telephone & Telegraph v. Commissioner, 77 T.C. at 84 n.26.  In light of the foregoing, we do not think we are precluded by International Telephone & Telegraph, from examining the question whether the fair market value of Metals' stock should be attributed in part to the conversion of the debentures by Metals and thus not constitute an element of loss upon redemption.[6]  Cf. National Can Corp. v. United States, 687 F.2d 1107, 1116 (7th Cir. 1982).

In our view, there were two elements involved in the issuance of Metals' stock:  (1) The acquisition of the debentures and the right to obtain reimbursement for the principal amount

[6]  We note that neither party has suggested that any provision of the existing consolidated return regulations applies to the instant case.  See National Can Corp. v. United States, 687 F.2d 1107, 1117 (7th Cir. 1982).

thereof from RMECC; and (2) the discharge of the conversion obligation under the indenture, an obligation which Metals had both directly and as guarantor of the conversion obligation of RMECC. On this basis, the excess of the fair market value of Metals' shares into which the debentures were converted over such principal amount would be attributable to the conversion feature and the balance to the debentures. Such an approach has been suggested, albeit implicitly, by National Can Corp. v. United States, supra, and Honeywell Inc. v. Commissioner, 87 T.C. 624 (1986) (in the context of disallowing the parent a deduction for bond premium under sec. 171);[7] see also Clark Equipment Co. v. United States, 912 F.2d 113 (6th Cir. 1990); Strasen, "The Taxation of Convertible and Other Equity-Flavored Debt Instruments," 65 Taxes 937 (1987); Committee on Taxation of International Finance and Investment of New York State Bar Association, Tax Section, "Report on International Finance Subsidiaries," 28 Tax L. Rev. 443 (1973). Under this approach, Metals' basis in the debentures would be limited to their

---

[7] We recognize that we looked askance at a breakdown of a convertible debenture into components in Hunt Foods & Industries, Inc. v. Commissioner, 57 T.C. 633, 641 (1972), affd. per curiam 496 F.2d 532 (9th Cir. 1974). But that case dealt with the rights of an issuer to deduct original issue discount in respect of the conversion feature of a debenture which involved the issuance of its own shares and not the shares of another corporation as is involved herein. Thus, Hunt Foods is distinguishable as are other cases relied upon by respondent to sustain her position herein.

principal amount, with the result that Metals would have neither gain nor loss on their redemption. The excess of the fair market value of Metals' shares over that amount would be considered a capital contribution by Metals to RMECC and an addition to Metals' basis in its RMECC shares. Cf. Honeywell Inc. v. Commissioner, supra at 641-642; see also Marathon Oil Co. v. Commissioner, 838 F.2d 1114 (10th Cir. 1987), affg. Husky Oil Co. v. Commissioner, 83 T.C. 717 (1984). That such value may not be an item that can be reflected in the capital account of RMECC does not negate the existence of a capital contribution. Commissioner v. Fink, 483 U.S. 89, 97 (1987).

Petitioners insist that the conversions encompassed only a single element, i.e., the acquisition of the debentures by Metals, that the fair market value of Metals' shares represents the cost of such acquisition and therefore the basis of the debentures and that it is error to bifurcate that cost into separate elements. The premise of petitioners' position, namely, the presence of a single element, is erroneous. What is involved herein is not a bifurcation of the cost of a single property; it is the apportionment of a value among the elements acquired for that value. Our approach is no different than what occurs, for example, in the apportionment of a purchase price of a business among the different assets, e.g., depreciable and nondepreciable, or different benefits, e.g., business assets and a covenant not

to compete.  Petitioners' reliance on <u>Republic Petroleum Corp. v. United States</u>, 397 F. Supp. 900, 919-920 (E.D. La. 1975), affd. in part and revd in part 613 F.2d 518 (5th Cir. 1980), is misplaced as that case involved only the acquisition of a single asset, stock.

Nor are we impressed with petitioners' attempt to salvage their position by asserting that the excess value involved herein represented an expenditure by Metals to discharge an obligation incurred in furtherance of a business purpose of its own.

Petitioners argue that Metals incurred the exchange obligation, and subsequently made the stock outlay on its own behalf, because it sought to increase its supply of Canadian aluminum.  It is, however, more accurate to state that Metals guaranteed the exchange of its stock so as to make RMECC's debentures marketable in the Eurobond market,[8] the sale of which enabled RMECC to acquire a majority of CBA's stock while BA, 48 percent owned by Metals, was able to raise cash to build new aluminum plants by selling its CBA stock to RMECC.  The link that petitioners fail to explain is why holding an 83-percent interest in CBA, through RMECC, its 100-percent owned subsidiary, improved its supply of Canadian aluminum as compared to when Metals owned

---

[8]  For discussion of the Eurobond market see New York State Bar Association, Tax Section, Committee on U.S. Activities of Foreign Taxpayers, "The Withholding of Tax on Interest Paid by U.S. Borrowers to Foreign Lenders," 6 Intl. Tax J. 126, 127 (1979).

31 percent of CBA directly and indirectly held 47 percent through
BA, of which it owned 48 percent.  The record does show that, in
1987, about 80 percent of CBA's sales were to affiliates, but
there are no earlier figures with which to compare.  The record
also shows that the production capacity of CBA's Baie Comeau
plant increased concurrently with the involvement of RMECC, but
the reasons go unexplained.  In short, we are not persuaded that
Metals' stock outlay was made in exchange for a direct and
quantifiable benefit to Metals so as to preclude a finding that
the outlay was a contribution to capital.  See Nalco Chemical Co.
& Subsidiaries v. United States, 561 F.Supp. 1274, 1289-1290
(N.D.Ill. 1983); cf. United States v. Chicago, B. & Q. R. Co.,
412 U.S. 401, 413 (1973).

Nor are we persuaded by the fact that Metals had a
conversion obligation under the indenture, for it is the origin
and nature of the obligation that determines deductibility.  See
Interstate Transit Lines v. Commissioner, 319 U.S. 590, 594
(1943); Eskimo Pie Corp. v. Commissioner, 4 T.C. 669, 677 (1945),
affd. 153 F.2d 301 (3d Cir. 1946).  The fact that this standard
has generally been articulated in the context of the issue
whether an expenditure is a deductible business expense under
section 162(a) or is a capital contribution under section 118(a)
does not impair its applicability in the instant case when the
capital nature of the transaction is considered.

Even if we were to accept petitioners' assertion as to Metals' objective in entering into the arrangements for and effecting the conversion of the RMECC debentures, the excess value of the Metals' shares would, at best, constitute a capital expenditure without a determinable useful life and would therefore not represent a deductible capital loss. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

The long and the short of the matter is that Metals' obligation to convert and its implementation of that obligation stemmed from its status as the sole shareholder of RMECC and has a strong "shareholder/investor aura". Centel Communications v. Commissioner, 92 T.C. 612, 637 (1989), affd. 920 F.2d 1335 (7th Cir. 1990) (taxpayer-corporation executed indemnification and subordination agreements in favor of corporation of which it was a shareholder). The fact of the matter is that the only thing of value that Metals acquired by the conversion was the right to obtain payment from RMECC of the principal amount of the debentures. Given the further fact that the holder of a convertible debenture will usually exercise his conversion right only where the value of the stock to be received on the conversion exceeds the amount of the debentures, see Honeywell Inc. v. Commissioner, 87 T.C. at 642, it is apparent that Metals had a guaranteed loss from the conversions.

To accede to petitioners' blandishments and hold that Metals is entitled to a capital loss would, in effect, be the equivalent of allowing a loss to which Metals was not entitled on the conversion, under section 1032, albeit as a capital loss rather than an ordinary loss, or the equivalent of a bond premium amortization deduction disallowed by section 249.

We are not prepared to accept such an eccentric result. See Darby v. Commissioner, 97 T.C. 51, 68 (1991). Petitioners assert that respondent has not pointed to any specific provision of the Internal Revenue Code that disallows the claimed capital loss. The simple answer to that assertion is that deductions are a matter of legislative grace, and it was petitioners' burden to demonstrate that the claimed capital loss was allowable under the Internal Revenue Code. INDOPCO, Inc. v. Commissioner, supra. They simply have not carried that burden.

We hold that petitioners are not entitled to deduct a capital loss for the amount of the excess of the fair market value of Metals' shares utilized in the conversion over the principal of the RMECC debentures. Such excess presumably will become part of Metals' basis in its RMECC shares.[9]

---

[9] The portion of the expenses of the conversion (and amounts paid for fractional shares), see supra note 5, represented by the fraction whose numerator is the principal amount of the debenture and whose denominator is the total value of Metals' stock issued on the conversions, would appear to be an additional capital loss which can be allocated to the value of the stock representing such principal.

To take into account the disposition of other issues by the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.